**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 10, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF
AMERICA,

     Plaintiff - Appellee,

v.

MICHAEL EUGENE
SIMPSON,

     Defendant - Appellant.

No. 15-1295

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:14-CR-00265-PAB-1)**
_____

Lynn C. Hartfield, Law Office of Lynn C. Hartfield, LLC, Denver, Colorado, for Appellant Michael Eugene Simpson.

Robert Mark Russel, Assistant United States Attorney (Robert C. Troyer, Acting United States Attorney, with him on the briefs), Denver, Colorado for Appellee United States of America.
_____

Before **TYMKOVICH**, Chief Judge, **EBEL**, and **BACHARACH**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

Based on a confidential informant's report that Mr. Simpson had

drugs and guns, law enforcement officers obtained a search warrant for his

house. The search revealed cocaine, firearms, and ammunition, and a jury later found Mr. Simpson guilty on 13 counts:

- Count 1: Possession of cocaine with intent to distribute, 21 U.S.C. § 841(a)(1) (2012);

- Count 2: Possession of a shotgun and ammunition by a felon, 18 U.S.C. § 922(g)(1) (2012);

- Counts 3-4: Possession of handguns and ammunition by a felon, 18 U.S.C. § 922(g)(1) (2012);

- Count 5: Possession of an unregistered shotgun, 26 U.S.C. § 5861(d) (2012);

- Counts 7-14: Possession of ammunition by a felon, 18 U.S.C. § 922(g)(1) (2012).

The district court imposed concurrent sentences of 240 months' imprisonment for Count 1 and 120 months' imprisonment for the remaining counts.

Mr. Simpson argues that we should reverse the conviction or, alternatively, the sentence. We affirm the conviction on Count 1 (possession of cocaine with intent to distribute) and Counts 2 and 5 (possession of an unregistered shotgun and ammunition). But we reverse the conviction on the other counts based on plain error in the jury instructions, remanding for a new trial. Finally, we reject Mr. Simpson's challenge to the sentence on Counts 1, 2, and 5.

2

## I.  Mr. Simpson's Appellate Arguments and Our Conclusions

Mr. Simpson raises four challenges to his conviction and one challenge to his sentence.

*First*, Mr. Simpson asserts that he should have been allowed to represent himself at trial. We reject this assertion.

At a hearing on the morning of trial, Mr. Simpson presented two motions: a written motion to represent himself and an oral motion to continue the trial. The district court asked Mr. Simpson if he was prepared to represent himself without a continuance, and he responded that he was not. From this exchange, the district court apparently understood that Mr. Simpson was not asking to represent himself if the trial were to proceed that morning. Based on this apparent understanding, the court denied the motion for self-representation, reasoning that it had been untimely. Mr. Simpson contends that his self-representation motion was not conditioned on a continuance and was timely.

We conclude that the court did not violate Mr. Simpson's right to self-representation. After denying a continuance, the district court did not address the possibility that Mr. Simpson might want to represent himself at that morning's trial. But if Mr. Simpson wanted to do that, he needed to make his desire clear. He didn't, for he never told the district court whether his self-representation motion was (1) a stand-alone motion or (2)

3

conditioned on the grant of a continuance. As a result, the district court did not err in treating the motion for self-representation as conditioned on the grant of a continuance.

The district court also properly ruled that Mr. Simpson's motion for self-representation had been untimely. In the district court's view, Mr. Simpson knowingly waited until the beginning of trial to seek a continuance, using the request as a delay tactic. This reasoning was permissible in light of Mr. Simpson's previous request for a continuance immediately before the trial was to begin.

*Second*, Mr. Simpson challenges the denial of the request for a continuance. We reject this challenge. The court had already granted one last-minute continuance to Mr. Simpson and had no obligation to grant a second last-minute request.

*Third*, Mr. Simpson challenges the handling of a discovery request. The request stemmed from the government's installation of a pole camera outside of Mr. Simpson's house prior to the execution of the search warrant. When Mr. Simpson learned of the camera, he asked for the footage, but the government answered that the footage was no longer retrievable because the camera's hard drive had crashed. Mr. Simpson then asked to conduct his own inspection of the hard drive, but the district court denied the request. Mr. Simpson challenges the denial of that request,

4

arguing that denial of this request violated the Federal Rules of Criminal Procedure and the U.S. Constitution. We reject these challenges.

Under the federal rules, Mr. Simpson would be entitled to discovery only if he had made a prima facie showing that the hard drive would help his defense. In his discovery motion, he tried to meet this standard by suggesting that the hard drive might support a motion to suppress the search warrant. In the motion, Mr. Simpson explained that the footage might be recoverable from the hard drive and, if so, the footage might show that the police informant had lied to law enforcement.

But even if these possibilities materialized, they would not have justified suppression of evidence: The movant cannot obtain suppression of evidence by challenging the informant's truthfulness; instead, the movant must show that the police affiant knowingly or recklessly submitted false information. Thus, Mr. Simpson's discovery motion provided no reason to believe that Mr. Simpson could satisfy his burden on a motion to suppress.

We also reject Mr. Simpson's constitutional challenges. Mr. Simpson did not make these challenges in district court; thus, we review the constitutional challenges only for plain error. Any possible error would not be plain, for we cannot easily infer that the hard drive would have supported Mr. Simpson's defense or that the police had acted in bad faith.

*Fourth*, Mr. Simpson challenges a jury instruction that defined "constructive possession." As Mr. Simpson argues, the instruction failed to

5

include an element of constructive possession: that the defendant had the "intent" to exercise dominion or control over the guns, ammunition, or drugs. This challenge was not raised in district court; thus, we apply the plain-error standard.

We reject this challenge as it pertains to Counts 1, 2, and 5. On Count 1, the jury found Mr. Simpson guilty of possession with intent to distribute cocaine. On Counts 2 and 5, the jury was presented with uncontroverted evidence that Mr. Simpson had held a loaded shotgun and had tried to sell it. Thus, for Counts 1, 2, and 5, the omission of "intent" from the jury instruction did not result in prejudice, which forecloses reversal under the plain-error standard.

For the remaining counts, however, we agree with Mr. Simpson. The jury instruction constituted an obvious error that was reasonably likely to create prejudice and to seriously affect the fairness, integrity, or public reputation of the judicial proceedings. As a result, we reverse the conviction on these counts and remand for a new trial.

*Fifth*, Mr. Simpson contends that the district court erred in increasing the sentence based on Sentencing Guideline § 3C1.2, "Reckless Endangerment During Flight." According to Mr. Simpson, he was sleeping in his vehicle when police surrounded him and ordered him to show his hands. Rather than comply, Mr. Simpson started his vehicle and rammed a

police vehicle parked behind him, leading the district court to find reckless endangerment of the police.

Mr. Simpson argues that this conduct was not reckless because he reacted instinctively, having just been awoken by individuals mistakenly thought to be assailants. In our view, the district court did not clearly err in finding that Mr. Simpson had known that he was surrounded by police. As a result, the district court did not err in applying § 3C1.2 to determine Mr. Simpson's sentence.

## II.    The Right to Self-Representation

Defendants must clearly assert their constitutional right to self-representation in order to invoke this right. Thus, if Mr. Simpson wanted to represent himself even without a continuance, he needed to make clear that his self-representation motion was not conditioned on the grant of a continuance. But Mr. Simpson did not make that intent clear.

Instead, Mr. Simpson appeared to package together his requests for self-representation and a continuance. In addressing these requests, the district court reasonably found that Mr. Simpson was seeking self-representation as a delay tactic. This finding fell within the district court's discretion, and the district court did not err in denying Mr. Simpson's request to represent himself.

7

**A.    The Sixth Amendment entitles criminal defendants to counsel and self-representation, but these rights lie in tension with one another.**

The Sixth Amendment provides criminal defendants with the right to represent themselves. *Faretta v. California*, 422 U.S. 806, 819-20 (1975).[1] But this right lies in tension with the Sixth Amendment right to counsel. *Id.* at 832 (noting that self-representation "cut[s] against the grain of this Court's decisions holding that the Constitution requires that no accused can be convicted and imprisoned unless he has been accorded the right to the assistance of counsel"). The right to counsel helps to assure a defendant a fair trial. *Id.* at 832-33. By contrast, self-representation ordinarily undermines the defendant's chance of a favorable outcome. *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984). In light of this reality, we have noted that the right to counsel serves "both the individual and collective good," while the right to self-representation protects only "individual interests." *United States v. Mackovich*, 209 F.3d 1227, 1237 (10th Cir. 2000) (citation omitted).

This distinction results in "constitutional primacy" of the right to counsel. *United States v. Smith*, 413 F.3d 1253, 1280 (10th Cir. 2005) (citation omitted), *abrogated on other grounds by Boyle v. United States*,

---

[1]    The right to self-representation is also provided in 28 U.S.C. § 1654 (2012) and Federal Rule of Criminal Procedure 44(a). *United States v. Treff*, 924 F.2d 975, 978 n.4 (10th Cir. 1991).

8

556 U.S. 938 (2009). Partly because of the primacy of that right, a defendant wanting to proceed pro se must satisfy four requirements:

> First, the defendant must "clearly and unequivocally" inform the district court of his intention to represent himself. Second, the request must be timely and not for the purpose of delay. Third, the court must conduct a comprehensive formal inquiry to ensure that the defendant's waiver of the right to counsel is "knowingly and intelligently" made. Finally, the defendant "must be 'able and willing to abide by rules of procedure and courtroom protocol.'"

*United States v. Tucker*, 451 F.3d 1176, 1180 (10th Cir. 2006) (citations omitted). In evaluating whether the defendant satisfied these requirements, we "indulge in every reasonable presumption against waiver." *Brewer v. Williams*, 430 U.S. 387, 404 (1977); *Smith*, 413 F.3d at 1280 (citation omitted).

### B.    Standard of Review

"When a motion to proceed pro se is made, we review de novo whether a constitutional violation occurred and for clear error the factual findings underlying the district court's decision to deny the motion." *Smith*, 413 F.3d at 1279.

### C.    The Necessity of a "Clear and Unequivocal" Request

Mr. Simpson did not clearly and unequivocally seek an opportunity to represent himself in the absence of a continuance.

### 1. The Necessity of a Clear and Unequivocal Request to Protect the Trial Court

In requiring "clear and unequivocal" expression of a request for self-representation, we protect not only the defendant but also the trial court. *United States v. Mackovich*, 209 F.3d 1227, 1236 (10th Cir. 2000); *United States v. Miles*, 572 F.3d 832, 836 (10th Cir. 2009). Without a clear and unequivocal request, the court would face a dilemma, for an equivocal demand creates a potential ground for reversal however the trial court rules. *Miles*, 572 F.3d at 836. If the court determines that the defendant wants to proceed pro se, the defendant can assert a violation of the right to counsel; if the court provides counsel, the defendant can assert a violation of the right to proceed pro se. *Id.*

By requiring the self-representation request to be clear and unequivocal, we prevent the trial court from having to guess at the defendant's intent. *Id.* at 836-37. Instead, the court can infer intent from the defendant's conduct and representations. *Id.* at 837; *see also United States v. Loya-Rodriguez*, 672 F.3d 849, 858-59 (10th Cir. 2012) (finding no clear request—even though the defendant expressly stated in a letter that he wanted to communicate without his attorney—because the letter, when "taken as a whole," could "fairly be read" to conclude that the defendant was not requesting self-representation). Thus, the absence of a

10

clear, unequivocal request can allow the court to reasonably infer that the defendant does *not* wish to proceed pro se. *Miles*, 572 F.3d at 837.

**2.      Mr. Simpson failed to clearly and unequivocally state whether he wanted to represent himself even without a continuance.**

We conclude that Mr. Simpson did not clearly and unequivocally seek self-representation if the district court were to deny a continuance.

On the morning of trial, Mr. Simpson presented the district court with two motions. The first was a written motion for self-representation. The motion did not expressly ask for a continuance, but implicitly did so by mentioning future discovery procedures. R. vol. 1, at 184 (requesting appointment of advisory counsel to "see that discovery procedures are followed"). The second was an oral motion for a continuance, which was based on the request for self-representation. Read together, the two motions stated that Mr. Simpson wanted to obtain more time for trial and to represent himself at the eventual trial.

But what if the court were to deny the requested continuance? The court explored this possibility, asking Mr. Simpson if he would be prepared to proceed pro se that day; he replied that he would not. R. vol. 3, at 167.

In this setting, Mr. Simpson's motion for self-representation could reasonably be read as expressing one of two things:

1.      *I want to represent myself* or

11

> 2.   *I want to represent myself only if the court grants a continuance.*

The district court believed that Mr. Simpson meant the latter and, as a result, conflated the two motions and denied them:

1.   First, the court denied the continuance, stating: "[T]his particular motion for a continuance is -- comes too late."

2.   Then, after Mr. Simpson presented further argument, the court denied the self-representation motion, responding: "I *still* find that the request for you to represent yourself . . . is late."

*Id*. at 169, 176 (emphasis added). Mr. Simpson contends that the district court should not have conflated the two requests, but we reject this contention.

We do so because Mr. Simpson did not clearly and unequivocally state that he wanted to represent himself even without a continuance. We must consider Mr. Simpson's statements in context and consider the inferences reasonably drawn by the district court. *See United States v. Miles*, 572 F.3d 832, 837 (10th Cir. 2009) (district court may "reasonably dr[a]w . . . inference[s]" from a defendant's action or inaction to decipher the defendant's intent). Thus, even when defendants appear to request self-representation, their other statements or actions may render the requests unclear or ambiguous. *See United States v. Bennett*, 539 F.2d 45, 50-51 (10th Cir. 1976) (defendant expressly requested self-representation, but his additional statements rendered his position on self-representation unclear); *see also United States v. Loya-Rodriguez*, 672 F.3d 849, 858 (10th Cir.

12

2012) (defendant's statement in a letter that he wanted "to communicate without the help of an attorney" was unclear, given the context of the letter and the defendant's subsequent silence when the district court invited the defendant to address the court if he wished).[2]

The written self-representation motion indicated a desire to engage in further discovery. Then, when the pretrial hearing began, Mr. Simpson orally requested a continuance. This request led the district court to ask Mr. Simpson if he was prepared to represent himself without a continuance; Mr. Simpson answered that he was not. This answer led the court to understand that Mr. Simpson did not want to proceed pro se without a continuance.

We do not know if this understanding was correct, but it was at least reasonable. *See Miles*, 572 F.3d at 837. Mr. Simpson could easily have clarified that he wanted to represent himself even without a continuance. But he admittedly "never asked if this w[ere] an option." Appellant's Opening Br. at 20.

In similar circumstances, we have indicated that the trial court could reasonably conclude that defendants wanted to represent themselves only if certain conditions were met. For example, in *Stallings v. Franco*, the defendant filed multiple motions, one stating that he wanted to proceed pro

---

[2] The dissent appears to agree that the surrounding circumstances bear on whether a defendant's request is clear and unequivocal. *See* Dissent at 2-4.

13

se but adding: "'Although I did ask to go pro-se, I am not prepared at this time for trial, because I do not know the rules and procedures to a New Mexico jury trial.'" 576 F. App'x 820, 823 (10th Cir. 2014). We concluded that the defendant had not made a clear, stand-alone self-representation request, as his motions could reasonably be read as "a request for conditional . . . representation." *Id*.[3]

Similarly, in *United States v. Smith*, the defendant made a self-representation request, but was unprepared for trial. 413 F.3d 1253, 1281 (10th Cir. 2005). Even though the defendant did not request a continuance, we assumed that granting the request "would mandate another lengthy continuance to allow Mr. Smith to prepare for his own defense." *Id*.; *see also United States v. Tucker*, 451 F.3d 1176, 1181 (10th Cir. 2006) (noting that in *Smith*, the need for a continuance was a "case-specific factor[] that made it proper for the district court to deny the defendant's motion").

We have also held that a defendant's request is not unequivocal when it simultaneously appears to request self-representation but adds a qualification that confuses what the defendant wants. For example, in *United States v. Callwood*, the defendant asserted that he preferred not to be represented by counsel, but he also said that he "at least" wanted to question a witness himself. 66 F.3d 1110, 1114 (10th Cir. 1995). We noted that the defendant had "never made any other statement regarding his

---

[3]    Though *Stallings* is not precedential, we regard it as persuasive.

14

desire for self-representation." *Id.* at 1114. Thus, we held that the defendant had not unequivocally requested an opportunity to represent himself. *Id*.

A similar issue arose in *United States v. Bennett*, 539 F.2d 45 (10th Cir. 1976). There the defendant asked to represent himself only at particular portions of the trial (hybrid representation). *Bennett*, 529 F.3d at 49-50. After the court denied that request, the defendant requested self-representation and the court granted his request. *Id.* at 50. But then the defendant reiterated that he preferred hybrid representation, causing the court to reinstate counsel. *Id.* This action led the defendant to renew his motion for self-representation. *Id*. We concluded that the defendant's motions and statements, in context, failed to present "a clear and unequivocal position on self-representation." *Id*. at 51.

Drawing on these opinions for guidance,[4] we conclude that Mr. Simpson did not clearly and unequivocally say whether his self-representation motion was a conditional motion or a stand-alone motion.[5]

---

[4] The dissent distinguishes some of these cases, stating that they entail greater ambiguity than exists here. Dissent at 5-7. Certainly the facts differ in each case, but they show that the surrounding circumstances can make a request for self-representation unclear or equivocal.

[5] Mr. Simpson argues that the district court should have clarified whether he wished to proceed pro se even without a continuance. *See* p. 19, below. In making this argument, Mr. Simpson implicitly appears to recognize that his request to proceed pro se was unclear in light of the

15

We can draw two reasonable conclusions: (1) Mr. Simpson wanted to represent himself even without a continuance, or (2) he wanted to represent himself only if he obtained additional time. We read the record with a presumption favoring exercise of the right to counsel;[6] we do not presume that Mr. Simpson wanted to represent himself unprepared.

The dissent disagrees, characterizing Mr. Simpson's request for self-representation as clear and unambiguous. Dissent at 2-4. In our view, the approach fails to accord deference to the district court's consideration. This deference is particularly appropriate in light of the presumption favoring exercise of the right to counsel. *United States v. Smith*, 413 F.3d 1253, 1280 (10th Cir. 2005); *see* pp. 8-9, above.

There were two possible ways to read the record. The dissent points to one possibility: that Mr. Simpson wanted to represent himself with or

---

denial of a continuance. *See* Appellant's Opening Br. at 17 ("[T]he court assumed *without asking* Mr. Simpson that in the absence of a continuance, he would prefer to proceed to trial with his court-appointed counsel . . . ." (emphasis added)); Oral Argument at 2:14-2:35 (response by Mr. Simpson's counsel—after being asked whether Mr. Simpson had unequivocally expressed an intent to proceed pro se without a continuance—stating that "*the record isn't quite that clear*" (emphasis added)); *id.* at 3:00-3:10 ("There was never a question to Mr. Simpson saying, look, I'm not going to give you a continuance, so you . . . have to pick, you have to go to trial with [your attorney] or you can represent yourself. *And that's what we're missing here.*" (emphasis added)); *id.* at 3:13-3:23 ("Because the court treated the two [motions] as being one motion . . . *we never got the answer as to whether Mr. Simpson wanted to represent himself* even with no continuance." (emphasis added)).

[6]     *See* pp. 8-9, above.

16

without a continuance and referred to future discovery only because he hoped that he would obtain more time to prepare. Dissent at 3. But this is not the only possibility. Mr. Simpson may have wanted to represent himself only if he had time to prepare. After all, he moved for a continuance shortly after requesting self-representation. And when presenting the two motions, Mr. Simpson stated that he was unprepared to represent himself without more time. Without an unequivocal request by Mr. Simpson, the district court could reasonably infer that the motion for self-representation had been conditioned on the grant of a continuance.

3.   **The government argued that in context, Mr. Simpson had failed to clearly and unequivocally seek self-representation in the absence of a continuance.**

The dissent questions the existence of an issue involving the clarity of Mr. Simpson's right to self-representation, stating that the government did not raise the issue either in district court or on appeal. Dissent at 1-2. We respectfully disagree.

In district court, the government was never asked for its position on self-representation. This issue did not arise until the day of trial, so the government never had an opportunity to brief the issue. When the parties appeared for trial, the district court questioned Mr. Simpson, who said that he was unprepared to represent himself that day. The court then denied Mr. Simpson's motions, and Mr. Simpson proceeded to trial with counsel without further objection. At this point, the government would have had

17

little to say, for Mr. Simpson's self-representation motion appeared to be intertwined with his continuance request. Presumably for that reason, the government was likely unaware that Mr. Simpson would eventually argue that he had wanted to represent himself even without a continuance. Thus, the government's silence in district court tells us little.[7]

This issue arose on appeal, and the government spoke up. Like the district court, the government interpreted Mr. Simpson's request for self-representation as conditional on a continuance: "Simpson plainly stated that he was not able to represent himself on the day of trial. V.1 at 167. It was abundantly clear that Simpson's request for self-representation was inherently linked to a request for significant delay." Appellee's Resp. Br. at 13.

The government did not question the clarity of the request for self-representation if the district court were to continue the trial. Nor do we. The difficulty lies if the court were to deny a continuance of the trial. In that circumstance, the government argues that Mr. Simpson did not ask for

---

[7]     After trial, Mr. Simpson filed a pro se motion for a new trial, alleging denial of his right to self-representation. The government did not respond to that motion. The dissent states that the government could have responded. That is true, but the government would have had little reason to do so. Mr. Simpson's argument on self-representation consisted of only a single sentence: "Mr. Simpson was denied constitutional right to self presentation [sic]." R. vol. 1, at 179. From this sentence, the government could not have known that Mr. Simpson would eventually claim that he had wanted to represent himself even without a continuance.

self-representation. We do not go as far as the government does; rather, we simply conclude that Mr. Simpson failed to clearly and unequivocally say whether his request for self-representation was conditioned on a continuance.

> **4. The district court was not required to further inquire into Mr. Simpson's intent.**

Mr. Simpson argues that the district court should have asked for clarification. But we have never required a district court to clarify an equivocal request. *See United States v. Tucker*, 451 F.3d 1176, 1180 (10th Cir. 2006) (noting that if a defendant does not "properly invoke[] his right to self-representation," the district court can deny the request); *United States v. Taylor*, 113 F.3d 1136, 1143 (10th Cir. 1997) (noting that only after a defendant makes an "unmistakable" self-representation request is the trial court obligated to ensure that the defendant knowingly and intelligently intends to waive counsel).

In light of our presumption against waiver of the right to counsel, we conclude that Mr. Simpson did not make an unequivocal request for self-representation in the absence of a continuance. Thus, the district court had no obligation to clarify Mr. Simpson's intent.

> **5. The district court's statements about Mr. Simpson's lack of preparedness do not change the result.**

In denying the motion, the district court commented on Mr. Simpson's lack of preparedness to represent himself without a continuance:

> [T]his particular motion for a continuance is -- comes too late. It's on the day of trial. Mr. Simpson is not in a position to represent himself on this matter. . . .
>
>       . . . [C]oming once again on the day of trial, the request to continue the trial, especially given the fact that Mr. Simpson is not in a position, understandably, since he is not an attorney, to step in and represent himself is too late.

R. vol. 3, at 169. But criminal defendants have a right to self-representation even when they are unprepared. *Godinez v. Moran*, 509 U.S. 389, 400 (1993). Pointing to this right, Mr. Simpson suggests that the district court erred by disallowing self-representation based on a lack of preparedness.

This suggestion is unpersuasive. A district court's comments regarding a defendant's lack of preparedness do not automatically justify reversal. Here, the comments did not drive the ruling, for the district court apparently believed that Mr. Simpson had conditioned his self-representation motion on the grant of a continuance.

Though Mr. Simpson's characterization is possible, the court's comments are ambiguous; we therefore will not construe the comments as improper. *See United States v. Nacchio*, 555 F.3d 1234, 1242 (10th Cir. 2009) (en banc) ("When a district court's language is ambiguous . . . it is improper for the court of appeals to presume that the lower court reached an incorrect legal conclusion." (ellipsis in original) (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 386 (2008))).

20

Our case law permits us to affirm the district court, notwithstanding the court's statements about a defendant's lack of preparedness, if the district court's decision appears to be justified by a valid reason. For example, in *United States v. Smith*, the district court denied the motion for self-representation, commenting that the defendant was "not capable of representing [him]self because of [his] inability to handle these kinds of complex issues." 413 F.3d 1253, 1280 (10th Cir. 2005). We observed that the court's comments were not dispositive:

> While we agree with Mr. Smith that his knowledge of the law and his ability to represent himself have no bearing on his choice to proceed pro se, *several other reasons support the District Court's decision.*

*Id.* (emphasis added) (citation omitted). In light of this observation, we upheld the denial of the defendant's motion for self-representation. *Id.* at 1281.

Similarly, in *United States v. Bennett*, the district court denied the defendant's self-representation motion on two grounds, one of which was the defendant's lack of qualifications to conduct a trial. 539 F.2d 45, 50 (10th Cir. 1976). As in *Smith*, we acknowledged that a defendant's "lack[] [of] expertise or professional capabilities [could not] justify denying the right of self-representation." *Id.* at 51. Nonetheless, we affirmed because the record had shown forfeiture of the right to self-representation. *Id.*

21

Mr. Simpson relies on *United States v. Baker*, 84 F.3d 1263 (10th Cir. 1996), and *United States v. McKinley*, 58 F.3d 1475 (10th Cir. 1995), but reliance on these opinions is misplaced. In these cases, the district courts did not provide valid reasons to disallow self-representation. In *Baker*, the district court relied solely on its concern that the defendant had lacked legal knowledge and would do a poor job of representing himself. 84 F.3d 1263, 1267 (10th Cir. 1996). In *McKinley*, the district court gave two reasons for denying the request for self-representation: the defendant's inability to competently represent himself and his use of the request for self-representation as a delay tactic. 58 F.3d 1475, 1481-82 (10th Cir. 1995) (emphasis omitted). But, we rejected both reasons. *Id.*

*Baker* and *McKinley* are distinguishable because in the present case, the district court's ruling is supported by a valid reason: the absence of a clear, unequivocal request for self-representation in the absence of a continuance.

**D.  The district court properly denied Mr. Simpson's motion for self-representation as untimely.**

Having interpreted Mr. Simpson's motion for self-representation as conditioned on the request for a continuance, the court concluded that the motion was untimely. According to Mr. Simpson, his motion was timely because it preceded impanelment of the jury. The government responds that the district court viewed the motion as untimely because it had constituted

a tactic for delay. In our view, the district court made a finding of improper delay and this finding was reasonable under the record.

## 1. A motion for self-representation is timely if it precedes impanelment of the jury unless the motion constitutes a delay tactic.

Until we addressed the issue in *United States v. Tucker*, our circuit had not clearly said what it meant for a motion to be "untimely." In *United States v. Mackovich*, we set forth the requirements for a defendant to invoke the right to self-representation. 209 F.3d 1227, 1236 (10th Cir. 2000). These requirements included the making of a request for self-representation "in a timely fashion." *Id.* Though we did not expressly mention "delay" in articulating the timeliness requirement, we affirmed because the defendant's motion had constituted an attempt "to delay the trial." *Id.* at 1238. We tied the concept of "delay" to the requirement of a clear, unequivocal request (the first requirement), stating that because the motions had been intended to delay the proceedings, they had not qualified as "unequivocal requests for self-representation." *Id.*

In *United States v. Akers*, we cited *Mackovich* and identified the same list of requirements. 215 F.3d 1089, 1097 (10th Cir. 2000). We held that the defendant's motion was "timely" because it had preceded the trial. *Id.* But we upheld the denial of the defendant's self-representation motion because it constituted a delay tactic. *Id.* at 1097-99. We treated this

23

concept of "delay" as an additional requirement rather than nesting it within one of the previously established requirements. *See id.* at 1097.

The waters were muddied in *United States v. Smith*, 413 F.3d 1253 (10th Cir. 2005). There we held that the defendant's motion was untimely because it constituted a delay tactic even though the motion had been made six days before trial. *Smith*, 413 F.3d at 1281. This determination seemed to conflict with *Akers*. Under *Akers*, Mr. Simpson's motion would have appeared timely because it had preceded the trial.

Clarity came with *United States v. Tucker*, 451 F.3d 1176 (10th Cir. 2006). In *Tucker*, we acknowledged the lack of clarity regarding when a self-representation motion is timely. 451 F.3d at 1180. In creating a new bright-line rule, we explained that the concept of "delay" relates to the timeliness of the request: "[A] motion for self-representation is timely if it is made before the jury is impaneled, unless it is a tactic to secure delay." *Id.* at 1181. Our opinion in *Tucker* clarifies that a motion for self-representation is untimely when

- the jury has already been impaneled or
- the defendant is attempting to delay the proceeding.

**2. The district court properly found that Mr. Simpson's self-representation motion had constituted a tactic for delay.**

The resulting inquiry involves two steps. First, did the district court make a finding of delay? Second, if the court made this finding, was it erroneous?

***The district court made a delay finding***. The district court did not expressly state that Mr. Simpson was trying to delay the proceeding. But we conclude that the district court did so implicitly.

In denying Mr. Simpson's motion, the district court apparently applied the new rule set out in *Tucker*. There we listed three factors bearing on consideration of the delay:

> [T]he determination whether a motion for self-representation is a tactic to secure delay . . . includes such considerations as [(1)] the actual delay that would be caused by granting the motion, [(2)] whether the delay could have been avoided if the defendant had made the request for self-representation earlier, and [(3)] whether the defendant had good reasons for not making the motion in a more timely manner.

*Tucker*, 451 F.3d at 1181-82. The district court tracked each factor in finding that the motion was untimely.

*Tucker Factor No. 1* (actual delay). The district court expressed concerns of actual delay, noting that a continuance of the trial would disrupt the court calendar and "inconvenience government witnesses" because "everyone [was] ready to go." R. vol. 3, at 169-70.

25

*Tucker Factor No. 2* (whether delay could have been avoided). Mr. Simpson claimed that he had decided to represent himself two weeks prior to trial. *Id*. at 170-72. But the district court concluded that Mr. Simpson could have avoided the delay, for he waited to file his motion or raise the self-representation issue with his attorney until the day that the trial was to begin. *Id*. at 168-69, 171-72, 176.

*Tucker Factor No. 3* (whether the defendant had provided good reasons for the delay). The district court concluded that Mr. Simpson had not provided good reasons for the delay. *Id*. at 169 ("The reason [Mr. Simpson] asks for a continuance I find is not a good one."). This conclusion contained three parts. First, the court discounted Mr. Simpson's assertion that he had not known when the trial was to begin. *Id*. at 168 ("[T]here is no reasonable expectation that there wouldn't be a trial . . . ."). Second, the court rejected Mr. Simpson's explanation for his dissatisfaction with his attorney. *Id*. at 168, 175. Finally, the court noted that Mr. Simpson had previously made a last-minute motion for a continuance. *Id*. at 169 (noting that Mr. Simpson had made his request "once again" on "the day of trial").

The district court's statements also reflected a finding of delay. For example, the court asked Mr. Simpson why he had "*delay[ed]*" in filing this particular motion." *Id*. at 171 (emphasis added).

Finally, under *Tucker*, a finding that a motion is "untimely" can have only two meanings: (1) the jury had been impaneled or (2) the defendant was trying to delay the trial. *See* p. 24, above. Because the jury had not been impaneled, the district court's explanation implied that Mr. Simpson had requested self-representation as a delay tactic.

Of course, it is possible that the district court did not know the law. For example, the district court may not have read *Tucker*. So perhaps the district court's timeliness finding was based on something other than delay. But we decline to presume that possibility. "When a district court's language is ambiguous . . . it is improper for the court of appeals to presume that the lower court reached an incorrect legal conclusion." *United States v. Nacchio*, 555 F.3d 1234, 1242 (10th Cir. 2009) (en banc) (ellipsis in original) (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 386 (2008)). Thus, we can fairly interpret the district court's ruling as based on Mr. Simpson's use of a delay tactic.

***The record supports the district court's findings***. Mr. Simpson asserts two primary challenges to the district court's reasoning: (1) He made his motion as soon as he could, and (2) the district court improperly relied on the previous request for a continuance on the day of trial.

We reject these challenges. Mr. Simpson argues that he made his motion on the day of trial because he had just learned that his attorney had failed to file various motions. Appellant's Opening Br. at 21-22. But, at

27

the pretrial hearing, Mr. Simpson admitted that he had actually decided two weeks earlier to represent himself. R. vol. 3, at 170-72. He explained that he had made this decision based on his attorney's refusal to file various motions.[8] *Id.* at 174-75. When asked why he had waited to seek self-representation, Mr. Simpson said that he had needed to consult with his attorney. *Id.* at 171. But Mr. Simpson's attorney said that he had not known about the request for self-representation until the morning of trial, and the district court credited the attorney's version of events. *Id.* at 172, 176. The district court did not err by believing the attorney over Mr. Simpson.[9]

---

[8] After learning that his attorney would not file these motions, Mr. Simpson filed the motions on April 1, 2015, five days before trial. He could have filed his self-representation motion then. Alternatively, he could have requested self-representation when he appeared at the trial preparation conference on April 3, 2015. Instead, Mr. Simpson waited until the day of trial.

[9] The dissent acknowledges that Mr. Simpson decided to represent himself two weeks before trial. Dissent at 10. But the dissent then characterizes this as only an "inclination" that Mr. Simpson decided to "act on" only later. *Id.* at 11. The record does not support this characterization: Mr. Simpson said that he had decided to represent himself two weeks before trial, but admitted that he had waited to file the motion because he wanted to consult with his attorney about how that scenario would procedurally work. R. vol. 3, at 170-72.

The district court also properly relied on Mr. Simpson's prior request for a continuance.[10] Mr. Simpson points out that the court had described that request as "totally appropriate" and acknowledged that Mr. Simpson had lacked "much control over that situation." *Id.* at 169; *see* Appellant's Opening Br. at 22. But those comments are not dispositive. When granting the initial continuance, the district court warned Mr. Simpson not to make another last-minute request for a continuance. R. vol. 3, at 746 (noting that Mr. Simpson "had [not] been diligent with this request" and stating that any future last-minute motions "would be highly suggestive of some manipulation by Mr. Simpson"). In light of this warning, we conclude that the district court properly relied on the fact that it had already granted a continuance on the day that the trial was to begin. As a result, we reject Mr. Simpson's challenge to the finding on timeliness.

## III. We affirm the denial of Mr. Simpson's request for a continuance.

Mr. Simpson also challenges the denial of his request for a continuance. We reject this challenge.

In considering this challenge, we apply the abuse-of-discretion standard. *United States v. Rivera*, 900 F.2d 1462, 1475 (10th Cir. 1990) (en banc). This standard requires us to consider Mr. Simpson's diligence in requesting a continuance, the likelihood that a continuance would

---

[10] Mr. Simpson's trial had previously been scheduled for December 15, 2014. On that morning, Mr. Simpson moved to substitute counsel and continue the trial. The district court granted this request.

accomplish the stated purpose, the inconvenience from the requested continuance, Mr. Simpson's demonstration of need for the continuance, and the expected harm to Mr. Simpson from denial of the continuance. *Id.*

These considerations provide reasonable support for the district court's ruling. The district court had previously obtained a last-minute continuance based on a change in counsel, and Mr. Simpson admits that another last-minute continuance "would have inconvenienced the court and the prosecution." Appellant's Opening Br. at 22. The inconvenience would affect not only the court and the prosecution but also jurors and witnesses:

> Of course, any continuance granted practically on the eve of trial inevitably will disrupt the schedules of the court, the opposing party, and the witnesses who have been subpoenaed or who have voluntarily arranged their schedules to attend the trial. When, as here, a jury trial is involved, there is additional potential inconvenience to jurors and to the court.

*United States v. Rivera*, 900 F.2d 1462, 1475 (10th Cir. 1990) (en banc) (footnote omitted).

Mr. Simpson's only stated justification for the continuance was his desire to represent himself, but that request had been denied. Thus, the district court did not abuse its discretion when denying another continuance of the trial.

## IV.   The Pole Camera

In their investigation, the police used information from a confidential informant. The informant told police that on June 12, 2014, he had seen

30

Mr. Simpson leave his house with a firearm. This information was included in an affidavit used to obtain a search warrant for Mr. Simpson's house.

After the warrant was executed, Mr. Simpson learned that police had installed a "pole camera" outside of his home on June 5, 2014. Mr. Simpson thought that the footage might show that he had not left his house with a firearm on June 12. As a result, he requested the footage. The government responded that the footage had been stored on a hard drive, but added that the hard drive had crashed, rendering the footage unavailable.

Mr. Simpson moved for authorization to inspect the hard drive. He explained that he might be able to recover the footage, which could reveal that the informant had lied about Mr. Simpson leaving his house with a firearm. If the informant had lied, Mr. Simpson theorized, he could move to suppress the results of the search:

> If in fact [the informant] fabricated that information . . . and if law enforcement officers knew or should have known of the fabrication, that information should have been included in the affidavit in support of the application for the search warrant. It was not so included, and discovery thereof would give Defendant Simpson grounds for a second motion to suppress the results of the search warrant on the grounds that exculpatory material was omitted, either deliberately or with reckless disregard, from the search warrant affidavit.

R. vol. 1, at 93 (footnote omitted). The district court denied the motion. According to Mr. Simpson, this denial violated Federal Rule of Criminal Procedure 16, *Brady v. Maryland*, and *Arizona v. Youngblood*. We reject these arguments.

31

## A.    Federal Rule of Criminal Procedure 16

Under Federal Rule of Criminal Procedure 16(a)(1)(E)(i), a criminal defendant enjoys a right to discovery of information that is "material to preparing the defense." The district court did not err in applying this rule.

### 1.    Mr. Simpson bore the burden to make a prima facie showing of materiality, and we review the district court's ruling only for an abuse of discretion.

The defendant bears the burden to make a prima facie showing of materiality. *United States v. Carrasquillo-Plaza*, 873 F.2d 10, 12 (1st Cir. 1989); 2 Charles Alan Wright, *Federal Practice and Procedure* § 254 (4th ed. 2009). The district court ruled that Mr. Simpson had not made this showing. We review this ruling only for an abuse of discretion. *United States v. Apperson*, 441 F.3d 1162, 1191 (10th Cir. 2006).

### 2.    In his discovery motion, Mr. Simpson did not make a prima facie showing of materiality.

In his discovery motion, Mr. Simpson speculated that the footage could diminish the informant's veracity, which in turn could provide grounds to suppress the results of the search warrant. But to justify suppression, Mr. Simpson needed to attack the veracity of the police affiant, not the informant. *United States v. Long*, 774 F.3d 653, 661 (10th Cir. 2014). Thus, the district court concluded that Mr. Simpson's theory would not support suppression of the evidence. R. vol. 3, at 824.

32

This ruling fell within the district court's discretion. In the discovery motion, Mr. Simpson stated that the police might have knowingly or recklessly omitted information in the affidavit accompanying the application for a search warrant. But Mr. Simpson did not indicate how access to the hard drive would help to show that the police affiant had knowingly or recklessly omitted information. As a result, the district court did not abuse its discretion in denying Mr. Simpson's discovery motion.

### 3. Mr. Simpson's new arguments are not persuasive.

On appeal, Mr. Simpson makes two new arguments for materiality of the hard drive:

1. The police might have known that the confidential informant had provided false information, as one of the police officers testified at trial that he had been able to view some of the footage.[11]

2. Access to the hard drive might have allowed impeachment or rebuttal of the confidential informant's trial testimony.[12]

Because Mr. Simpson did not make these arguments in district court, our review is only for plain error. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016). The plain-error standard contains four elements:

---

[11] The officer indicated that he had been able to log into a specified web address to view the footage in real time. He did not state that he had viewed the footage downloaded onto the hard drive.

[12] Mr. Simpson also alleges that the police affiant failed to mention the installation of the pole camera or to explain why the footage had not been reviewed. Appellant's Opening Br. at 29. But Mr. Simpson could have made these allegations without the footage.

1. The district court made an error.

2. The error was plain.

3. The error affected the defendant's substantial rights.

4. The error seriously affected the fairness, integrity, or public reputation of judicial proceedings.

*United States v. Mendiola*, 696 F.3d 1033, 1036 (10th Cir. 2012). In rejecting Mr. Simpson's arguments, we rely on the third element, which requires a "reasonable probability" that the outcome would be different. *Id.* at 1042-43.

This burden entails more than allegations about what the video would show. Instead, Mr. Simpson had to show prejudice based on evidence. *See United States v. Gonzales-Huerta*, 403 F.3d 727, 736 (10th Cir. 2005) (en banc) (holding that the defendant "bears the burden to establish by a reasonable probability based upon the record on appeal that his substantial rights were affected").

Mr. Simpson cannot satisfy this burden because he cannot show what would be depicted on the video. This inability is not Mr. Simpson's fault; nonetheless, this inability prevents Mr. Simpson from satisfying the third element of the plain-error standard.

## B. *Brady v. Maryland*

Mr. Simpson argues that the government's failure to provide the hard drive violated the government's disclosure obligations under *Brady v.*

34

*Maryland*, 373 U.S. 83, 87 (1963). Because Mr. Simpson did not make this argument in district court, our review is for plain error. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016). For the second element, an error is considered "plain" only if it is "so clear or obvious that it could not be subject to any reasonable dispute." *United States v. Courtney*, 816 F.3d 681, 684 (10th Cir.), *cert. denied*, 2016 WL 4141537 (Oct. 3, 2016).

To prevail on his *Brady* claim in district court, Mr. Simpson had to demonstrate three elements:

1.    The prosecution suppressed evidence.

2.    That evidence was favorable to Mr. Simpson.

3.    The suppressed evidence was material.

*United States v. Acosta-Gallardo*, 656 F.3d 1109, 1117 (10th Cir. 2011).

To decide this issue, we apply the second element of the plain-error test (the existence of an obvious error) to the second element of Mr. Simpson's underlying claim (the favorable nature of the suppressed evidence). In our view, Mr. Simpson has not satisfied his burden because the hard drive would not obviously have favored Mr. Simpson.

Our opinion in *United States v. Acosta-Gallardo* is persuasive. *Id.* In that case, the police waited too long to disclose that a witness would testify about the defendant's handling of various jars used to store methamphetamine. *Id.* The defendant alleged a *Brady* violation, arguing that if he had known about the proffered testimony earlier, he would have

requested a continuance and had the jars fingerprinted. *Id.* According to the defendant, the fingerprinting results might have been exculpatory. *Id.* We concluded that the defendant had failed to satisfy *Brady*'s favorability element, as "no one knows whether the results would have been favorable to [the defendant]." *Id.*

Similarly, no one knows whether the hard drive would have been favorable to Mr. Simpson. Mr. Simpson would need to successfully retrieve the footage from the crashed hard drive and then show that the footage had not depicted him brandishing a firearm. Thus, the footage was not plainly favorable to Mr. Simpson's defense.[13]

---

[13] The Supreme Court's opinion in *Pennsylvania v. Ritchie* does not suggest otherwise. There a defendant accused of rape had requested access to an agency's file on the victim and a purported medical report. 480 U.S. 39, 43-44 (1987). The agency asserted that no medical report existed, and the prosecution was not aware of any such report. *Id.* at 44 & n.4. Thus, the trial judge refused to compel the agency to turn over the victim's file. *Id.* at 44. The Pennsylvania Supreme Court reversed, holding that the defendant was entitled to review the agency's file. *Id.* at 51.

The U.S. Supreme Court affirmed in relevant part under *Brady v. Maryland*. *Id.* at 57-59. The Court acknowledged that it was "impossible to say whether any information in the [agency] records may be relevant to [the defendant's] claim of innocence, because neither the prosecution nor defense counsel ha[d] seen the information." *Id.* at 57. Nevertheless, the Court remanded for the trial court "to determine whether [the file] contains information that probably would have changed the outcome of his trial." *Id.* at 58.

On its face, *Ritchie* appears to involve similar facts. Like the defendant in *Ritchie*, Mr. Simpson sought information that may or may not be exculpatory. But *Ritchie* is distinguishable for two reasons.

36

## C.    *Arizona v. Youngblood*

Mr. Simpson also relies on *Arizona v. Youngblood*, where the Supreme Court held that the police's bad-faith failure to preserve potentially exculpatory evidence may violate the right to due process. 488 U.S. 51, 58 (1988). Mr. Simpson asserts that the district court should have inquired into the circumstances in which the hard drive crashed. Because Mr. Simpson did not make this argument in district court, we confine our review to the plain-error standard. *See* pp. 33-34, above. Under this standard, we reject Mr. Simpson's argument, for the existence of a *Youngblood* violation was not obvious.[14]

Five factors bear on the inquiry into bad faith:

---

First, the *Ritchie* Court was not reviewing *Brady*'s favorability requirement. Rather, the Court was responding to the State's specific arguments regarding the third *Brady* prong (materiality). Because the Court was not considering *Brady*'s favorability prong, our opinion in *Acosta-Gallardo* constitutes the governing precedent. *See United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37-38 (1952) (stating that an opinion does not constitute binding precedent on an issue not discussed).

Second, unlike in *Ritchie*, we are reviewing the district court's ruling under the plain-error standard. *See United States v. Mota*, 685 F.3d 644, 649 (7th Cir. 2012) (noting that the plain-error standard in the *Brady* context is stricter than the general *Brady* standard). We do not foreclose the possibility that an error might have taken place; rather, we simply hold that any error would not have been plain.

[14]    Mr. Simpson also cites *California v. Trombetta*, 467 U.S. 479, 489 (1984), where the Supreme Court held that the police must generally preserve evidence with "apparent" exculpatory value. But Mr. Simpson's brief makes no argument supporting application of the *Trombetta* standard.

(1) whether the government had explicit notice that [the defendant] believed the [evidence] was exculpatory; (2) whether the claim that the evidence is potentially exculpatory is conclusory, or instead "backed up with objective, independent evidence. . ."; (3) whether the government could control the disposition of the evidence once [the defendant] indicated that it might be exculpatory; (4) whether the evidence was central to the case; and (5) whether the government offers any innocent explanation for its disposal of the evidence.

*United States v. Smith*, 534 F.3d 1211, 1224-25 (10th Cir. 2008) (citation omitted). Two factors weigh against Mr. Simpson.

First, Mr. Simpson's claim is conclusory, for he has no way of knowing whether the hard drive would have contained anything exculpatory.

Second, the government had an innocent explanation for the loss of the footage: The hard drive crashed.

Mr. Simpson argues that further inquiry might have generated proof of bad faith. But again, the district court did not plainly err by failing to inquire further.

According to Mr. Simpson, the court "never conducted any inquiry into whether the government had knowledge of the [hard drive's] exculpatory value." Appellant's Opening Br. at 32. But the government expressly represented that it had no such knowledge. Further inquiry could have appeared unnecessary.

Mr. Simpson also points out that a police officer testified that he had viewed excerpts of the footage without specifying what the excerpts contained. *Id*. But Mr. Simpson could have asked the officer at trial what the excerpts contained. And, even if the viewed excerpts did not show Mr. Simpson with a gun on June 12, the officer might reasonably have believed that Mr. Simpson's appearance with a gun had appeared in a different part of the footage. Thus, the police officer's testimony does not plainly suggest bad faith.

* * *

In applying the plain-error standard, we conclude that the district court did not commit reversible error by disallowing further inquiry into the unavailability of the hard drive.

## V. The Jury Instructions

Mr. Simpson also challenges a jury instruction that defined "constructive possession":

> A person who, although not in actual possession, knowingly has the power at a given time to exercise dominion or control over an object, either directly or through another person or persons, is then in constructive possession of it.

Supp. R. vol. 3, at 204. Under this instruction, the jury could find constructive possession over any items that Mr. Simpson knowingly had the power to control, such as the guns, ammunition, and drugs.

39

During this appeal, the law changed when our court held that constructive possession contains an additional element: intent. It was no longer enough to show that Mr. Simpson knew about the items and could control them. Instead, the government needed to also show that Mr. Simpson had intended to exercise control over the items. *United States v. Little*, 829 F.3d 1177, 1182 (10th Cir. 2016) (citing *Henderson v. United States*, 135 S. Ct. 1780, 1784 (2015)).

Because Mr. Simpson did not raise this objection in district court, our review is for plain error. *See United States v. Lin*, 410 F.3d 1187, 1190 (10th Cir. 2005); *see also* pp. 33-34, above.

The government concedes that the first two elements of the plain-error test are satisfied: the existence of an error and the plain or obvious nature of that error. *See* pp. 33-34, above. We agree with the parties that the first two elements are satisfied.

The parties' disagreement involves the third and fourth elements: whether the error affected Mr. Simpson's substantial rights and seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016). We reject Mr. Simpson's arguments on Counts 1, 2, and 5, but agree with Mr. Simpson on the remaining counts.

A.    **Count 1 (Possession of Cocaine with Intent to Distribute)**

Mr. Simpson cannot satisfy the third element of the plain-error test with regard to Count 1. On this element, Mr. Simpson needs to "'show a reasonable probability that, but for the error,' the outcome of the proceeding would have been different." *Id.* (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 76, 82 (2004)). He cannot meet that burden here.

For Count 1, the jury found not only that Mr. Simpson had possessed cocaine, but also that he had intended to distribute the cocaine. Mr. Simpson could intend to distribute the cocaine only if he intended to possess it, for he could not distribute something that he didn't have. *See United States v. Paredes-Rodriguez*, 160 F.3d 49, 55 (1st Cir. 1998) ("[I]t simply makes no sense to assert that the same jury that found that [the defendant] intended to distribute the cocaine could have simultaneously found that he did not intend to possess it."). Thus, we know that the instructional error did not affect the outcome on the charge of possession with intent to distribute.

Because the jury found Mr. Simpson guilty on this count, we know that the jury would have found that Mr. Simpson had intended to possess the cocaine.[15] In these circumstances, the outcome on Count 1 would likely

---

[15] Mr. Simpson argues that "the jury's verdict does not necessarily mean that it found that *Mr. Simpson intended* to possess the cocaine; it merely means that the jury [(1)] found that Mr. Simpson had knowledge of, and the power to exercise control over,

41

have stayed the same with a legally correct instruction on constructive possession. Thus, we reject the challenge to Count 1 under the third element of the plain-error test.

### B.    Counts 2 and 5 (Unlawful Possession of an Unregistered Shotgun and Ammunition)

We also conclude that on Counts 2 and 5, Mr. Simpson cannot show a reasonable likelihood of a different outcome without the erroneous jury instructions.

Police found a loaded shotgun inside Mr. Simpson's garage. At trial, an officer testified that Mr. Simpson had admittedly held the shotgun and tried to sell it about a month prior to his arrest. R. vol. 3, at 645-46. Mr. Simpson did not impeach the officer or present any evidence contradicting the officer's testimony. At closing argument, the government urged the jury to consider that testimony when deciding the verdict. *Id.* at 687. The jury found that Mr. Simpson had possessed the loaded shotgun.

In reaching this finding, the jury likely believed the officer's uncontradicted testimony that Mr. Simpson had intentionally handled the shotgun and tried to sell it.[16] As a result, we believe that a properly

---

the cocaine, and that [(2)] the *cocaine* was intended for distribution." Appellant's Supp. Br. at 14-15 (emphases in original). This argument is foreclosed by Jury Instruction No. 17, which permitted a finding of guilt only if "the defendant [had] possessed the substance with the intent to distribute it." Supp. R. vol. 3, at 193.

[16]    Mr. Simpson claims that the record does not state when the handling occurred. Appellant's Supp. Br. at 6. But the officer

42

instructed jury would probably have arrived at the same result. Thus, Mr. Simpson failed to satisfy the third element of the plain-error test on his challenge to Counts 2 and 5.

C.    **Counts 3-4 and 7-14 (Unlawful Possession of Handguns and Ammunition)**

The remaining counts involve the discovery of handguns and ammunition for the handguns:

- Count 3: A Bersa .380 caliber handgun and ammunition was found in an unlocked safe in Mr. Simpson's basement.

- Count 4: A Smith & Wesson .40 caliber handgun and ammunition was found under the driver's seat of a car registered to Mr. Simpson's wife.

- Counts 7 to 10: Ammunition was found in an unlocked safe in Mr. Simpson's basement.

- Counts 11 to 13: Ammunition was found in Mr. Simpson's kitchen cabinets and on top of his refrigerator.

- Count 14: Ammunition was found on a desk in Mr. Simpson's basement.

Mr. Simpson jointly occupied each of these locations with his wife, and visitors had access to these places. Thus, Mr. Simpson urges a reasonable probability that a properly instructed jury would have found him not guilty on Counts 3-4 and 7-14. We agree with Mr. Simpson.

1.    **The Third Element**

---

testified that the incident had taken place in mid-May 2014. *See* R. vol. 3, at 645. This period would have fallen within the alleged time-period for Counts 2 and 5 (May 1, 2014, to June 19, 2014).

43

Under the third element of the plain-error standard, "[a] plainly erroneous jury instruction affects a defendant's 'substantial rights' if the instruction concerns a principal element . . . of the crime, thus suggesting that the error affected the outcome of the case." *United States v. Duran*, 133 F.3d 1324, 1330 (10th Cir. 1998).

This test was satisfied, for the erroneous jury instruction had omitted an important element of the crime, intent, and the defense's theory had focused on that element. To counter this defense, the government emphasized in closing argument that the jury should find guilt if Mr. Simpson had known of the handguns and ammunition and had enjoyed the ability to control them. *See United States v. Bader*, 678 F.3d 858, 869 (10th Cir. 2012) (noting that the prosecution's theory at closing argument bears on whether an erroneous jury instruction was prejudicial). The government's argument would have been untenable if the jury had been told of the intent element.

The government points to evidence that could support a finding of intent. For example, a police informant testified that he had seen Mr. Simpson discussing, holding, and brandishing firearms. In addition, a police officer testified that Mr. Simpson had admittedly held each of the handguns.

Even with the government's evidence, there is a reasonable probability that the outcome would have been different with a correct jury

44

instruction. The jury may or may not have decided to credit the testimony of the informant, considering that Mr. Simpson had elicited evidence bearing on impeachment.[17] *See On Lee v. United States*, 343 U.S. 747, 757 (1952) ("The use of informers . . . may raise serious questions of credibility.").

The government also points to the evidence that Mr. Simpson had admitted holding the handguns. But the jury could have concluded that Mr. Simpson had handled the handguns at a time different than that alleged in the indictment.

The district court instructed the jury that possession of the handguns and ammunition must have taken place on or about June 19, 2014. The jury was also told that the government had to prove beyond a reasonable doubt that Mr. Simpson had possessed the guns and ammunition reasonably near the dates reflected in the jury instructions.

There was little evidence about when Mr. Simpson had handled the handguns; the police officer said only that Mr. Simpson had admittedly

---

[17]     According to the government, the finding of guilt on the drug count suggests that the jury credited the informant's testimony. Maybe. But the jury could also have found guilt on the drug count based on the presence in the house of almost 20 grams of cocaine and items used to sell cocaine (baggies, scales, razor blades, and a glass beaker). We have no way of knowing whether the jury believed the informant's testimony. *See United States v. Alexander*, 817 F.3d 1205, 1214-15 (10th Cir. 2016) ("[D]ue to the instructional error we have identified, we cannot determine the basis for the jury's verdict.").

shown his wife how to fire the handguns in the two months prior to the arrest.

Based on that testimony, the jury could have concluded that Mr. Simpson had not handled the handguns on or about June 19, 2014. Therefore, the jury could reasonably have concluded that Mr. Simpson had not intended to possess the handguns and ammunition on or about the applicable dates. In these circumstances, the instructional error affected Mr. Simpson's substantial rights on Counts 3-4 and 7-14.

## 2.    The Fourth Element

Finally, we conclude that the instructional error seriously affected the fairness, integrity, or public reputation of the judicial proceedings.

To satisfy this test, a defendant would need to show that the error is "particularly egregious" and that failure to notice the error would result in a "miscarriage of justice." *United States v. Johnson*, 414 F.3d 1260, 1264 (10th Cir. 2005). But because the present case involves a constitutional error, our analysis is "less rigid[]." *Id.*; *see Neder v. United States*, 527 U.S. 1, 12 (1999) ("[A]n improper instruction on an element of the offense violates the Sixth Amendment's jury trial guarantee.").

A failure to properly instruct the jury on an element would not always satisfy the fourth element of the plain-error test. *United States v. Wolfname*, 835 F.3d 1214, 1223 (10th Cir. 2016). But because the government's evidence on intent was not overwhelming, the instructional

error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *See id.* (concluding that the failure to instruct on an essential element of the crime satisfied the fourth element of the plain-error test because the government's evidence on the omitted element of the crime was neither overwhelming nor uncontroverted).

\* \* \*

We conclude that (1) the district court plainly erred in instructing the jury on Counts 3-4 and 7-14, (2) the error affected Mr. Simpson's substantial rights, and (3) the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings.

## VI. Reckless Endangerment

Mr. Simpson's arrest involved a struggle, resulting in a sentencing enhancement. Mr. Simpson challenges the enhancement, and we reject the challenge.

As the police executed the search warrant, Mr. Simpson was sitting in the driver's seat of his car with the seat in a reclined position. He says that he was asleep and intoxicated.

While he was allegedly sleeping, the police parked a SWAT vehicle behind Mr. Simpson's car to block it in. The police then approached Mr. Simpson's vehicle in SWAT gear with guns and flashlights drawn,

47

demanding that Mr. Simpson show his hands. He didn't. Instead, he started his car and backed it into the SWAT vehicle.[18]

At sentencing, the district court determined that this conduct justified application of U.S. Sentencing Guideline §3C1.2, which provides a two-level increase "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S. Sentencing Guidelines Manual § 3C1.2 (U.S. Sentencing Comm'n 2014). Mr. Simpson contends that he reacted instinctively, for he had been drinking and was awoken by people who he thought were assailants. Appellant's Opening Br. at 34-36. We reject this contention with respect to the sentence on Counts 1, 2, and 5.

We review the district court's finding for clear error. *United States v. Conley*, 131 F.3d 1387, 1389 (10th Cir. 1997). In applying this standard, we view the evidence and draw all reasonable inferences in the light most favorable to the court's finding. *Id.*

The district court found that Mr. Simpson had known that he was surrounded by police officers and had acted purposefully. The court

---

[18]    One of the police officers testified that Mr. Simpson had rammed the SWAT vehicle at least three times; another officer testified that Mr. Simpson had rammed into the vehicle only once. When sentencing Mr. Simpson, the district court indicated that it believed that Mr. Simpson had rammed the vehicle multiple times. R. vol. 3, at 900 (noting that Mr. Simpson "was then ramming the vehicle that he was in into the back of the [SWAT vehicle]").

48

acknowledged that Mr. Simpson had not heard the officers identify themselves as police. But the court noted that

- the police had ordered Mr. Simpson to show his hands and

- Mr. Simpson could have seen the police through his windows.

R. vol. 3, at 900. Based on this conduct, the district court found that Mr. Simpson had acted recklessly when starting his vehicle and ramming it into the SWAT vehicle. *Id.* at 900-01.

The district court's determination was not clearly erroneous. Were we the trier of fact, we might have come to a different conclusion. The night was dark, and the police were shining flashlights at Mr. Simpson. Mr. Simpson might have been afraid and unaware that the individuals were police officers. But, viewing the evidence and drawing all reasonable inferences favorably to the district court's finding, we conclude that the district court's finding was not clearly erroneous. Thus, we affirm the court's application of the enhancement for reckless endangerment.

## VII. Disposition

We affirm Mr. Simpson's conviction and sentence on Counts 1, 2, and 5. For the remaining counts, we reverse Mr. Simpson's conviction and remand for a new trial.

United States v. Simpson, No. 15-1295

**EBEL**, J., dissenting.

Contrary to the majority opinion, I would hold that the district court erred by denying Simpson his constitutional right to represent himself. Therefore, I would reverse the convictions. Since I do not prevail on that issue, I am also writing separately to supplement the majority's reasoning on the pole-camera video evidence. On that issue, I agree with the majority that there was no error regarding the exclusion of that evidence insofar as the search warrant was concerned—and, regarding the use of that evidence for impeachment at trial, Simpson has not satisfied the third prong of plain-error review. I write separately only because of the potential for a new trial here during which Simpson will have a new opportunity to request inspection of the pole camera video evidence for trial purposes. In that eventuality, if Simpson were to preserve the issue properly, I believe he has offered a theory of materiality that satisfies his prima facie burden under Federal Rule of Criminal Procedure 16. Thus, if the government chooses to retry Simpson on the remanded counts, Simpson should be allowed to examine the pole-camera evidence.

## I.  Right to self-representation

The majority opinion finds two reasons why Simpson's self-representation motion was defective—that it was not "clear and unequivocal" and that it was a delay tactic.

A. Clear and unequivocal

Our case law requires a "clear and unequivocal" request to dispense with counsel. While the majority opinion concludes that Simpson's request was not clear enough, the

district court did not address that question and the government never argued it below or on appeal.[1]  So at the outset I am skeptical of relying on an argument that was neither argued below nor preserved on appeal.[2]

Simpson in fact did clearly and unequivocally invoke his constitutional right to represent himself.  On the morning of trial, Simpson submitted a handwritten motion for self-representation, which unambiguously asserted his right to proceed pro se.  (Motion to Proceed in Propria Persona, Sui Juris, R. Vol. I at 183-84) ("Comes now, Michael E. Simpson, the Accused, proceeding in Propria Persona, Sui Juris[,] and respectfully moves this court to grant the above entitled motion[.]").  His motion cites and explains the touchstone Supreme Court case recognizing that constitutional right, Faretta v. California, 422 U.S. 806, 819-820 (1975), and enumerates reasons why he was

---

[1] See Oral Argument at 1:12-1:17 (statement by Simpson's counsel: "It's undisputed that the motion clearly and unequivocally requested self-representation . . . .").

[2] At oral argument, Simpson's counsel responded to the panel's questions about whether the request was "clear and unequivocal," see Oral Argument at 1:36-4:42, but aside from that colloquy, there was no adversarial attention given to the topic.  The majority says that the government had no reason to argue this below because Simpson made the request the day of trial and "the government was never asked for its position on self-representation."  (Maj. Op. at 17).  But as the majority acknowledges, Simpson filed a post-verdict motion for new trial raising this self-representation issue and the government could have responded at that time.  Further, I disagree with the majority that the government eventually "spoke up" on appeal by arguing the motions for self-representation and continuance were "inherently linked."  (Maj. Op. at 17-18).  In that argument, the government was asserting that the two connected motions "support a finding that Simpson's request was untimely and manipulative," (Aple. Br. at 12)—that is quite different from arguing the "clear and unequivocal" prong of the self-representation analysis.  Moreover, the government cites to none of the cases relied upon by today's majority to find ambiguity in this case, and so Simpson would have no opportunity to assist this Court in properly interpreting those authorities.  It is for that reason, in part, that we should not rely on arguments that were not made by the parties.

dissatisfied with his lawyer, many of which had only arisen within the preceding few days. This unambiguous written request should be the end of the matter.

But the majority finds ambiguity in that document because it also requests the appointment of advisory counsel for several purposes, including assistance with discovery procedures.[3] (Maj. Op. at 10-11). Contrary to the majority opinion, I would not read this reference to discovery as "implicitly" requesting a continuance, (Maj. Op. at 11), thereby muddying the clarity of the written motion for self-representation. Instead, the discovery reference only suggests that Simpson hoped his separate oral motion for a continuance would be granted, and that an advisory lawyer could assist with discovery matters before the newly scheduled trial date. But even assuming there was an implicit request for a continuance in the written motion for self-representation, it would not dilute the clarity of his distinct request for self-representation. It is difficult to imagine how a defendant could be any more "clear and unequivocal" than what Simpson wrote in this motion.

The majority then turns to the oral colloquy between the trial court and Simpson to find ambiguity where, in my view, there is none—at least none attributable to Simpson. The record shows that Simpson (1) asked to represent himself and, because he was not

---

[3] The motion says: "The appointment of advisory counsel can relieve the Judge of the need to explain and enforce basic rules of courtroom protocol or to assist the accused in overcoming routine procedural or evidentiary obstacles that stand in the way of the accused achievements of his own clearly indicated goals. U.S. v. Thomas, 220 F. Supp. 2d 430 [sic]. Also, such assigned counsel would be available at least to meet with the prosecuting attorney, *to see that discovery procedures are followed*. The necessary motions are made, to confer with accused, to be present with the accused in the courtroom during trial, and otherwise to do those things associated with the case, which the accused is unable to do for himself." (R. Vol. I at 184) (emphasis added).

3

prepared to do so that day, he (2) requested a continuance. These are two separate, but related, motions. I agree with the majority that the district court "conflated" them. (Maj. Op. at 12). But the majority concludes this conflation was reasonable, and thus not erroneous, because of a particular back-and-forth between Simpson and the district court. That conversation is worth considering again:

> **THE COURT:** Okay. So, Mr. Simpson, let me just ask you this, and that is is [sic] what you are — you are asking for a continuance, but you are also asking to represent yourself in this proceeding, but with advisory counsel appointed?
>
> **THE DEFENDANT:** Yes.
>
> **THE COURT:** Would you be prepared to go to trial today representing yourself?
>
> **THE DEFENDANT:** No, sir, not today.

R. Vol. III at 167. When Simpson said he would not be prepared for trial that day, the district court was assuming that Simpson *only* wanted to represent himself if he received a continuance, i.e., that the self-representation motion was conditional on moving back the trial date.

But that interpretation was unreasonable. The context of the conversation was whether to move back the trial date. As such, in responding that he was unprepared for trial that day, Simpson was simply arguing that the *court should grant the continuance* based on his lack of preparedness—he did not in any way state, nor imply, that he would revoke his self-representation motion if a continuance was denied. To the extent that the district court believed otherwise, that was not Simpson's fault. Even still, however, the

4

majority holds that Simpson should have clarified that "he wanted to represent himself *even without a continuance*." (Maj. Op. at 13) (emphasis added). But our case law has never required that a defendant bolster an otherwise unmistakable motion for self-representation with a supplemental assertion that he remains earnest in that request notwithstanding the outcome on other pending motions.

The majority then turns to case precedent that found ambiguity in the request for self-representation under different circumstances. But those cases involved situations where there was far more doubt as to whether the defendants actually were invoking their self-representation right. In United States v. Miles, (cited by Maj. Op. at 12, 13), we found waiver of the self-representation right when the district court asked the defendant, "Are you now asking counsel to take over for you?," to which he responded "I think, at this point, yes." 572 F.3d 832, 837 (10th Cir. 2009). In other words, the defendant affirmatively declared he wanted his lawyer to take over for him. That did not happen here. In fact, just the opposite, as Simpson repeatedly expressed dissatisfaction with his lawyer and affirmatively asked to represent himself.

In Stallings v. Franco, (cited by Maj. Op. at 13), an unpublished case, the defendant submitted multiple motions, one of which actually asked for appointment of a lawyer outside the Public Defender's office, and another stated: "*Although* I did ask to go pro-se, I am not prepared at this time for trial, because I do not know the rules and procedures in a New Mexico jury trial." 576 F. App'x 820, 823 (10th Cir. Aug. 20, 2014) (unpublished) (emphasis added). With no accompanying request for a continuance, and by prefacing his statement with the word "although," it was reasonable

5

for the district court in <u>Stallings</u> to conclude that he was qualifying or retreating from his earlier motion for self-representation.

In <u>United States v. Smith</u>, (cited by Maj. Op. at 14), the Tenth Circuit did not expressly ground its decision on the ambiguity of the defendant's request, but rather on its untimeliness. 413 F.3d 1253, 1279 (10th Cir. 2005) (after reviewing the law, including the "clear and unequivocal" standard, "we conclude that the District Court did not err when it found that [defendant] did not intend to abide by courtroom decorum and that his request was not timely made."), <u>abrogated on other grounds by Boyle v. United States</u>, 556 U.S. 938 (2009). That being said, the invocation of the self-representation right in <u>Smith</u> was woefully ambiguous. The district court even asked if the defendant sought to dispense with counsel, to which the defendant responded that "he did not have the education to represent himself and simply wanted new counsel." <u>Id.</u> at 1279. But when the defendant indicated "he might have to be disruptive in trial in order to properly defend himself," <u>id.</u> at 1280, the district court cautiously treated that statement as an assertion of the self-representation right. The defendant's comments in <u>Smith</u>, unlike Simpson's statements *and written motion* in our case, demonstrated a highly equivocal invocation of the right.

In <u>United States v. Callwood</u>, (cited by Maj. Op. at 14), the defendant informed the district court that he "would *prefer* for counsel not to represent defendant or *at least* the right to question the witness himself." 66 F.3d 1110, 1114 (10th Cir. 1995) (emphasis added). We held that, at most, he was requesting a "hybrid" representation where he could "question the witnesses while continuing to retain counsel." <u>Id.</u> The

6

majority today correctly characterizes <u>Callwood</u> as a case where the defendant "never made any other statement regarding his desire for self-representation." <u>Id.</u> That case is a far cry from the one before us today. Simpson made clear his desire to go forward pro se in a separate written motion and in his colloquy with the district court.

In <u>United States v. Bennett</u>, 539 F.2d 45, 51 (10th Cir. 1976), (cited by Maj. Op. at 15), the defendant repeatedly "vacillat[ed]" between requests for hybrid-representation (splitting trial tasks between the defendant himself and trial counsel) and full self-representation. At one point, the defendant stated: "*It is my statement now that I know I am not a qualified attorney to conduct a full trial*, but there are certain aspects of the trial that I feel that I am competent to proceed with." <u>Id.</u> at 50 (emphasis added). After the defendant changed his mind multiple times, the district court concluded: "we have fenced around long enough." <u>Id.</u> Again, as in the previously cited cases, <u>Bennett</u> involved a degree of ambiguity that far exceeded the equivocation (if any) in Simpson's colloquy with the district court in this case.

Although I believe the majority's cited cases involved far more ambiguity than did Simpson's colloquy here, I agree with the majority about the purpose of the "clear and unequivocal" standard from these cases—it is to avoid putting a district court in a dilemma where "an equivocal demand creates a potential ground for reversal however the trial court rules." (Maj. Op. at 10). If the court has to guess at what the defendant wants, then it may incorrectly determine that he either wanted to keep his lawyer (stripping him of a right to self-representation), or that he wanted to proceed pro se, thereby

7

surrendering his constitutional right to counsel. So defendants can make ambiguous demands and then appeal their convictions no matter the court's ruling.

But that dilemma did not exist here. With this record, had the district court granted the self-representation motion and Simpson lost at trial, Simpson could not have successfully argued *post hoc* that he was unconstitutionally denied the assistance of counsel—after all he *waived* that right by submitting a clear and unequivocal request to represent himself. He might have had at least a colorable claim that the court abused its discretion in denying his separate motion for a continuance, but that would have been a separate matter. As described above, the fact remains that any ambiguity was created by the district court itself—either by misunderstanding Simpson's request, or by failing to treat separately his scheduling request (the continuance) from his motion to invoke a constitutional right (self-representation).

### B. Purpose of delay

A motion for self-representation may be rejected if made for the purpose of delaying the proceedings. See United States v. Tucker, 451 F.3d 1176, 1180 (10th Cir. 2006); United States v. Mackovich, 209 F.3d 1227, 1237-38 (10th Cir. 2000). The government argues, and the majority today concludes, that Simpson's request was a tactic for delay. I disagree.

At the outset, the district court never actually found that Simpson's motion was made for the purpose of delaying the trial. The majority acknowledges as much, but

8

references several statements that it concludes amounted to the district court's "implicit" finding of intended delay. (Maj. Op. at 25). I am wary to sign on to that approach.

Rather than hang the decision on implicit findings of the district court, I would instead rely on what the court said *explicitly*. In considering Simpson's request for self-representation, the district court found that his earlier continuance request was "totally appropriate" and acknowledged that Simpson did not have "much control over that situation."[4] (R. Vol. III at 169). Yet the majority dismisses this explicit finding as "not dispositive." (Maj. Op. at 29). In my view, this finding has meaning. It makes this case different from others like Mackovich, where the district court found the self-representation motion was "merely an effort to again delay the trial, and [was] an abuse of the judicial process," 209 F.3d at 1237, and where the judge pointed to a long period of disruptive tactics by the defendant, id. Unlike in Mackovich, the district court here did not find that Simpson had demonstrated such a pattern of delay tactics.

Turning away from the district court's findings, and looking to the record itself, it appears that Simpson chose to represent himself not to manipulate the process or delay the trial, but because he was genuinely dissatisfied with his lawyer. Consider first the explanation that Simpson actually offered, both in his written motion and in the colloquy. He explained that his motion was based on his lawyer's failure to keep Simpson informed about case developments and the failure to file certain motions that Simpson believed were important to his defense. While a defendant's purported intentions are not

---

[4] This was not Simpson's first request for a continuance—his trial was originally scheduled for December 15, 2014, but after Simpson's family swapped out his lawyers (without his knowledge) at the last minute, the district court pushed the trial date back.

9

dispositive of whether a motion is intended for delay, they are at least a starting point for analyzing the purpose of the motion.

But the government dismisses Simpson's explanation based on the timing of his request. The government argues that if Simpson decided to represent himself two weeks before trial, then why did he wait until the morning of trial to file the motion? The majority concludes that Simpson could have requested self-representation earlier, and his failure to do so suggests a purpose of delay. But I am not so sure.

Consider the sequence of events leading up to the district court's denial of the motion on the morning of trial, April 6, 2015. A week and a half before the trial date, Simpson asked his lawyer to file certain jurisdictional motions which Simpson had written. But the lawyer found them frivolous and refused to file them.[5] Upon learning they were not filed, Simpson himself submitted them to the court on April 1. However, on April 2, the district court denied those motions because they were not filed by Simpson's lawyer.[6] On April 3, a Friday, the parties held a pretrial conference at which Simpson learned that his motions were stricken. Over the weekend, on the eve of trial, realizing that his lawyer would not file his motions and that he could not file them

---

[5] There was certainly an adequate basis to believe they were frivolous. In one motion, Simpson argued he was a "Noble of the Al Moroccan Empire" and thus not bound by the laws of the United States. (Dist. Ct. Doc. 127). In another, Simpson gave notice of a name-change based upon "Divine Law; Natures Law; Universal Law; Moorish Birthright; International Law; and Constitutional Law[.]" (Dist. Ct. Doc. 128). And another sought a copy of a "Certified Delegation of Authority Order" that showed the district court had jurisdiction to hear the case. (Dist. Ct. Doc. 129). Despite the frivolity of these motions, however, there is no indication that they were not genuine.

[6] When a defendant is represented by counsel, a court will not ordinarily accept pro se filings from that defendant. See United States v. Sandoval-De Lao, 283 F. App'x 621, 625 (10th Cir. 2008) (unpublished) (collecting cases).

10

himself so long as he had a lawyer, Simpson may have tossed up his hands and finally decided to act on his inclination to proceed pro se. That next Monday morning, April 6, 2015, he filed for self-representation.

With this sequence of events in mind, the timing of Simpson's self-representation request does *not* suggest a purpose of delaying trial—but rather a late realization that his lawyer was not representing his perceived best interests and that the court would not consider his jurisdictional motions unless he dispensed with counsel.[7] Moreover, to confirm that his attempt to dispense with counsel was genuine, rather than a delay tactic, Simpson again sought to represent himself *after* the trial for sentencing proceedings. (Dist. Ct. Doc. 156, 158). In my view, that adds confirmatory support to the conclusion that Simpson had genuinely wanted to represent himself all along.

For the above reasons, I am not persuaded by the majority's and the government's arguments. More fundamentally, I am concerned that today's decision will water down a constitutional right which ought to remain potent—the right to dispense with counsel. Because I find, on this record, no ambiguity in Simpson's request, and no evidence that Simpson had a purpose of delay, I would reverse the convictions based on the district court's denial of Simpson's constitutional right to self-representation. Thus, on this issue, I respectfully dissent.

---

[7] The lateness of this decision itself does not make it untimely because, as the majority acknowledges, a motion for self-representation is timely if made before the jury is impaneled. See Tucker, 451 F.3d at 1181. Simpson's motion was made before the jury was impaneled.

11

## II.    Pole-camera evidence

The majority also finds no reversible error in denying Simpson's motion to inspect the pole camera and hard drive.  On this issue, I concur in the majority's outcome and rationale.  I write separately on this issue only to add that, under Federal Rule of Criminal Procedure 16, the government cannot block access to potentially material evidence in its control when the defendant alleges a specific theory of how the evidence could be material to his defense, and where the specific evidence cannot be knowable by the defendant until it is produced by the government for the defendant's examination.

In Simpson's original motion to inspect, he offered one theory of how the surveillance footage would be material to his defense: access to the video would enable him to challenge the search warrant based on reckless omissions by the affiant.  The district court denied that motion, and the majority correctly affirms that denial because Simpson failed to make a prima facie showing that the video would be material to his effort to challenge the search warrant.

On appeal, for the first time, Simpson offers a second theory for why the video would be material: it would enable him to *impeach* the government's star eyewitness at trial, Kenneth Tillman.  I agree with the majority that Simpson has failed to establish a "reasonable probability" that this impeachment theory, if adopted by the district court, would have changed the outcome in the trial.  (Maj. Op. at 34).  Thus, at this stage of the proceedings, where we are reviewing his claim for plain error, Simpson's claim fails.  But because we are remanding on some counts, there is a possibility of a new trial.  If that occurs, the pole camera evidence may again become relevant and this time Simpson

12

might timely ask to inspect that the pole camera and hard drive under the theory that it may help him impeach the government's star eyewitness at trial. Thus, because of that eventuality, I would go further than the majority opinion. I would hold that Simpson's impeachment theory is valid and satisfies his prima facie burden to show materiality under Federal Rule of Procedure 16, and thus the government must permit Simpson to examine the pole-camera evidence if the government pursues a new trial on any remanded counts.

Consider what the video evidence would allegedly show. The pole camera was installed across the street from Simpson's home on June 5, 2015, and would have captured footage of events occurring outside the residence after that date. Tillman, the government's star eyewitness, claimed at trial that Simpson exited his home on June 12, 2015, brandishing a firearm, (R. Vol. III at 374), and then Tillman entered the house and Simpson began bragging about his other guns, (Id. at 376-77). But Simpson alleges the video footage would prove Tillman was never at the house on the dates claimed, and so could not have observed those events. It would also show, according to Simpson, a lack of traffic associated with drug dealing. All of this would be helpful to Simpson's defense as impeachment evidence against Tillman—which would unquestionably be material in light of the fact that Tillman was the government's only eyewitness.[8]

---

[8] It is generally said that, under Rule 16, "conclusory allegations of materiality[do not] suffice[.]" See, e.g., United States v. Mandel, 914 F.2d 1215, 1219 (9th Cir. 1990). But Simpson does not just allege that the video would be material as a general matter—he claims a *specific* use (impeachment) with respect to a *specific* witness (Tillman), and even points out *specific* aspects of the video that would be exculpatory (Tillman's absence on particular date). There is nothing conclusory about Simpson's claim.

With this, Simpson has met his prima facie burden. At least under Rule 16, we should not fault Simpson for failing to prove in advance what the video would show. That would be circular—Simpson needs the video to prove he is telling the truth, he cannot be expected to first prove his story in order to get access to a video he says is the very item needed to prove that story.[9] Chief Justice John Marshall acknowledged this impossibility over two centuries ago: "Now, if a paper be in possession of the opposite party, what statement of its contents or applicability can be expected from the person who claims its production, he not precisely knowing its contents." United States v. Burr, 25 F. Cas. 187, 191 (C.C.D. Va. 1807) (No. 14,694). And in a related context, the Supreme Court recognized that "it is impossible to say whether any information in the [sought-after] records may be relevant to [Defendant]'s claim of innocence, because neither

---

[9] The majority correctly cites to United States v. Acosta-Gallardo for the proposition that Brady's materiality requirement is not satisfied when "no one knows whether the [disclosed item] would have been favorable to [the defendant]." 656 F.3d 1109, 1117 (10th Cir. 2011). While Acosta-Gallardo makes it difficult for Simpson to satisfy plain error on his Brady argument, I do not view that case as dispositive of the alleged Rule 16 violation. Rule 16 is broader than the Brady rule. See, e.g., United States v. Muniz-Jaquez, 718 F.3d 1180, 1183 (9th Cir. 2013) ("Rule 16 is thus broader than Brady. Information that is not exculpatory or impeaching may still be relevant to developing a possible defense."); United States v. Caro, 597 F.3d 608, 620 (4th Cir. 2010) (same); United States v. Baker, 453 F.3d 419, 424 (7th Cir. 2006) (same); Fed. R. Crim. P. 16 advisory committee's note to 1974 amendment (stating that in revising Rule 16 "to give greater discovery to both the prosecution and the defense," the committee had "decided not to codify the Brady rule"); 2 Charles Alan Wright, Federal Practice and Procedure § 256 (4th ed. 2009) (explaining that inculpatory material or ambiguous information falls outside the scope of Brady but is discoverable under Rule 16). The Brady rule is a constitutional floor—binding in federal and state courts alike—and the Federal Rules of Criminal Procedure may, as they have done in Rule 16, provide a federal standard above that floor. Thus, while the majority takes no position on this issue, I would note that Acosta-Gallardo's holding on Brady's materiality requirement does not extend to the more defense-favorable standard under Rule 16.

14

prosecution nor defense counsel has seen the information." <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 57 (1987) (remanding to determine whether certain nondisclosed records, the information in which was unknown to all parties, would have changed the outcome of the trial if properly disclosed).[10]

A contrary conclusion would be a dangerous precedent in federal courts. To permit the government to sit on allegedly unrecoverable evidence and prevent the defendant from determining whether the evidence is recoverable would allow the government to withhold potentially material evidence when the government *alone* can assess the usefulness of that evidence. <u>See generally</u> <u>United States v. Budziak</u>, 697 F.3d 1105, 1113 (9th Cir. 2012) ("While we have no reason to doubt the government's good faith in such matters [referring to Rule 16 requests], criminal defendants should not have to rely solely on the government's word that further discovery is unnecessary."). It is particularly disconcerting when the defendant, as here, alleges a specific purpose for the evidence that would be material to his legal defense. Thus, while I agree with the majority's treatment of this issue in full, I would hold further that, upon a new trial, the government should allow inspection of the pole camera and hard drive.

\*     \*     \*

---

[10] As the majority correctly points out, this case is not squarely on point—it addresses materiality in the context of a <u>Brady</u> violation, i.e., unconstitutional nondisclosure. But it is instructive that the Supreme Court has also found it unfair for a defendant, at least in the <u>Brady</u> context, to be forced to *prove* the materiality of a record he has not seen.

15

In sum, on the issue of self-representation, I conclude that the district court erred by denying Simpson's request. It was neither ambiguously invoked, nor motivated by a desire to delay. Thus, all of Simpson's convictions should be reversed. However, since the majority disagrees with me on that dispositive issue, I turn to the evidentiary issue of discovery of the pole-camera and hard drive. On that matter, I concur with the majority that reversal is not warranted based on Simpson's failure to satisfy plain-error review— but I have written separately to add that the government's refusal to allow inspection here was improper and, upon any new trial on the counts that are being remanded, the government should permit Simpson to examine the pole-camera and hard drive.