**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 23, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

LUIS GOMEZ-CASTRO,

    Defendant - Appellant.

No. 18-4090
(D.C. No. 2:16-CR-00267-DN-1)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **HOLMES**, **MURPHY**, and **PHILLIPS**, Circuit Judges.

Defendant-Appellant Luis Gomez-Castro appeals from his conviction and sentence for possession of methamphetamine with intent to distribu doite, pursuant to 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Mr. Gomez-Castro raises three arguments on appeal: first, that the district court committed three reversible errors in its jury instructions; second, that the district court abused its discretion in denying Mr. Gomez-Castro's motion for a new trial; and third, that the district court erred in imposing a sentence enhancement for obstruction of justice.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and 10th Circuit Rule 32.1.

Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we reject Mr. Gomez-Castro's three arguments and **affirm** his conviction and sentence.

**I**

In early 2015, law enforcement agents of the Federal Bureau of Investigation ("FBI") began investigating Mr. Gomez-Castro—a resident of North Salt Lake, Utah—for suspected drug trafficking. As part of the investigation, a confidential informant named Reuban Morales provided FBI agents with Mr. Gomez-Castro's phone number. On August 14, 2015, the FBI obtained authorization to install a thirty-day wiretap on Mr. Gomez-Castro's phone.

The wire intercepted a series of twenty-nine phone calls by Mr. Gomez-Castro from September 8 to September 12, 2015, in which he arranged to purchase methamphetamine from a Mr. Fernando Lopez and another suspected supplier. At one point during his calls to Mr. Lopez, Mr. Gomez-Castro indicated that a load of methamphetamine was soon headed to the local area. Based on that statement, FBI agents made plans to seize the drugs and arrest Mr. Gomez-Castro. The agents enlisted the confidential informant, Mr. Morales, to help. At the FBI's direction, Mr. Morales ordered methamphetamine from Mr. Gomez-Castro.

On the morning of September 12, 2015, Mr. Gomez-Castro made several calls to the suspected supplier and arranged to meet him at a house early that afternoon. Mr. Gomez-Castro also called Mr. Morales and told him to come to his apartment. Not long after he arrived, both men left the apartment complex and drove separately

2

to meet the suspected supplier. Two local police officers followed them to the meeting place. When they arrived at the house, they walked down a short driveway and met someone standing outside. The police officer surveilling the men did not want to be spotted, so he drove past the house and parked in a location where he could see Mr. Gomez-Castro's car but not see what exactly the three individuals were doing in the driveway. Nonetheless, after a fairly short period of time, the police officer saw Mr. Gomez-Castro and Mr. Morales walk back toward their vehicles and drive away separately from the house.

At approximately 2:00 p.m. on September 12, 2015, law enforcement officers executed a search warrant for Mr. Gomez-Castro's apartment. When they arrived, the officers found Mr. Gomez-Castro flushing methamphetamine down the toilet. Nonetheless, they managed to recover about forty-two grams of the drug. After his arrest, Mr. Gomez-Castro offered to work as an FBI informant. FBI agents initially agreed to this proposal, but within a few months they ended the arrangement, purportedly because Mr. Gomez-Castro put "very minimal effort" into it. R., Vol. III, at 356 (Trial Tr., dated Oct. 25, 2017).

## II

### A

On June 1, 2016, the government indicted Mr. Gomez-Castro on one count of possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The indictment also alleged that Mr. Gomez-Castro committed this

3

drug-trafficking offense under an aiding-and-abetting theory, pursuant to 18 U.S.C. § 2.

At trial, Mr. Gomez-Castro testified that his girlfriend, Ms. Elizabeth Figueroa, had become an informant for the Ogden, Utah Police Department to "work off her [drug-related] charges." R., Vol. III at 388 (Trial Tr., dated Oct. 25, 2017). To help Ms. Figueroa do so, Mr. Gomez-Castro claimed that he tried to obtain information on "people who had something so that I could tell her and she could give [the Ogden, Utah police] the information." *Id.* at 388. Mr. Gomez-Castro further claimed that he had also previously worked directly with the Ogden Police Department as an informant, although not at the time of his arrest. Still, Mr. Gomez-Castro testified that he thought that by arranging for a drug deal for Mr. Morales he could "get involved with people who had things so that I could find out who had them so that I could help [Ms. Figueroa]." *Id.* at 390.

Mr. Gomez-Castro also testified that Mr. Morales planted the methamphetamine in his apartment, and that he did not know it was there until the police arrived to execute the search warrant. According to Mr. Gomez-Castro, after meeting with the suspected supplier he drove around for twenty minutes "killing time" while Mr. Morales returned to the apartment and left a box with Ms. Figueroa without explanation. *Id.* at 390–91. Mr. Gomez-Castro insisted that once he returned home he repeatedly tried to call Mr. Morales, but he never answered, and

4

that he only opened the box—which contained the methamphetamine—once he saw the police arriving.

On cross-examination, when questioned about his alleged law enforcement informant handler in the Ogden Police Department, Mr. Gomez-Castro could only remember his first name, "Adam." *Id.* at 417. When asked about the names of the people whose contact information he provided to Adam, he was unable to remember any, other than an "Armando." *Id.* at 417–18. He was also questioned about his interview with an FBI agent on September 12 soon after his arrest. In particular, Mr. Gomez-Castro was asked why he did not tell the FBI agent that Mr. Morales had dropped off the methamphetamine in a box while he was gone, or that he was trying to help Ms. Figueroa work off charges from the Ogden police. Mr. Gomez-Castro replied, "[the FBI agent] was the one that was asking the questions there, and I couldn't do anything. He was the one asking the questions, and I just had to answer." *Id.* at 419–20.

The government called three witnesses in rebuttal. The first witness was an Ogden Police Department lieutenant who testified that he had never worked with a detective named "Adam," and that he knew of no detectives named "Adam" on the Ogden Police Department's Weber-Morgan Narcotics Strike Force, a multi-jurisdictional task force in Utah devoted to investigating drug offenses. He further testified that based on his review of the written records of informants working for the Crime Reduction Unit and the Weber-Morgan Narcotics Strike

5

Force, no records indicated that either Mr. Gomez-Castro or Ms. Figueroa had been officially signed up as informants. However, the lieutenant acknowledged that a person could work as an informant without being signed up formally.

The government also called a Salt Lake City police officer who had arrested Ms. Figueroa for obstruction of justice and possession of methamphetamine in October 2014. The officer could not recall if Ms. Figueroa was ever officially signed up as an informant, but when asked if Ms. Figueroa ever worked for him the officer replied, "she never did anything that we would consider [] working for us." R., Vol. III, at 450 (Trial Tr., dated Oct. 26, 2017).

Finally, the government called the FBI agent leading the investigation to testify about the numerous drug-related phone calls made by Mr. Gomez-Castro and intercepted by the wiretap. Moreover, the agent testified that he reviewed Mr. Gomez-Castro's phone records and found no evidence that Mr. Gomez-Castro had tried unsuccessfully to call Mr. Morales numerous times after purportedly discovering the box left at his apartment. The agent also said that when he interviewed Mr. Gomez-Castro after his arrest on September 12, Mr. Gomez-Castro made no mention that he had worked, or was working, as an informant for the Ogden Police Department.

**B**

Partially at issue in this appeal are three instructions given to the jury throughout Mr. Gomez-Castro's trial. As a preliminary matter, we summarize each set of instructions here.

First, throughout the trial proceedings, the district court repeatedly instructed the jurors that they could discuss the evidence before formal deliberations began as long as they were all together in the jury room and no one else was present. For example, in its written preliminary jury instructions, the court informed the jurors:

> [U]ntil this trial is over, the only time that you may discuss the evidence is when you are all together so that (1) each of you is present during the discussion, (2) in the jury room, (3) with no one else present. If one of those three conditions is not met, you may not discuss the case. That means that under any other circumstances you are not to discuss the case with fellow jurors or anyone else or permit anyone to discuss it with you.

Supp. R., Vol. VI, at 43 (Prelim. Jury Instrs., Instr. No. 13, dated Oct. 24, 2017). At least twice throughout the trial, the district court judge gave similar instructions to the jurors. Mr. Gomez-Castro never objected to the instructions during his trial.

Second, in connection with the allegation that Mr. Gomez-Castro aided and abetted the possession of methamphetamine with the intent to distribute, the district court provided the following final instructions to the jury:

> You may also find the defendant guilty if you find he aided and abetted another in the commission of the crime charged. Aiding and abetting is simply another way of committing the offenses charged. The aiding and abetting statute, Section 2(a) of Title 18 of the United States Code provides that: [w]hoever commits an

7

offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

Supp. R., Vol. VI, at 71 (Final Jury Instrs., Instr. No. 38, dated Oct. 17, 2017). At trial, defense counsel lodged several general objections to the court's aiding-and-abetting instructions but did not specify the grounds for the objection.

Finally, the district court supplied the following instructions on the elements of constructive possession for Mr. Gomez-Castro's charge for possession of methamphetamine with intent to distribute:

> As I have instructed you, you must determine whether the defendant "possessed" the controlled substance. The legal concept of possession may differ from the everyday usage of the term, so I will explain it in some detail.
>
> Actual possession is what most of us think of as possession; that is having physical custody or control of an object. For example, if you find that the defendant had the controlled substance on the defendant's person, you may find that the defendant had possession of the controlled substance. However, a person need not have actual physical custody of an object in order to be in legal possession of it. If an individual has the ability to exercise substantial control over an object that he does not have in his physical custody, then he is in possession of that item.
>
> Possession of a controlled substance cannot be found solely on the grounds that the defendant was near or close to the controlled substance. Nor can it be found simply because the defendant was present at a scene where the controlled substance was involved, or solely because the defendant associated with a person who does control the controlled substance or the property where the controlled substance is found. However, these factors may be considered by you, in connection with all other evidence, in making your decision whether the defendant possessed the controlled substance.

8

Supp. R., Vol. VI, at 63 (Final Jury Instrs., Instr. No. 30, dated Oct. 17, 2017). Mr. Gomez-Castro did not object to these instructions during his trial.

## C

On October 26, 2017, a jury found Mr. Gomez-Castro guilty of possession of methamphetamine with intent to distribute. Sometime in mid-November 2017, before his sentencing, Mr. Gomez-Castro claimed that he finally remembered, for the first time, the name of the Ogden Police Department officer for whom he had worked as an informant: "Don Jensen." R., Vol. I., at 154 (Mot. for New Trial, dated Jun. 11, 2018). An investigator later tracked down a "Don Johnson," a former Weber-Morgan Narcotics detective in the Ogden Police Department. R., Vol. I, at 139 (Decl. of Craig Watson, dated May 10, 2018). Mr. Johnson indicated that he had been a member of the Weber-Morgan Narcotics Task Force in 2013 and 2014, and he recalled having used an informant during that period by the name of Luis Castro. The investigator sent a picture of Mr. Gomez-Castro to Mr. Johnson, and Mr. Johnson confirmed that he had used the person in the photo as a confidential source.

Mr. Gomez-Castro's sentencing hearing centered in part on his alleged work as an informant for Mr. Johnson and the Ogden Police Department. The presentence investigation report ("PSR") recommended a two-level enhancement in Mr. Gomez-Castro's Guidelines offense level. With this enhancement, his total advisory

Guidelines sentencing range was 151 to 188 months of imprisonment.[1]  The

recommended sentence enhancement was based on the prosecution's assertion that

Mr. Gomez-Castro had committed perjury at trial—namely, by falsely claiming to

have worked as a police informant.

Mr. Gomez-Castro objected to the PSR's recommended enhancement and

indicated that the newly discovered Mr. Johnson could confirm his claims.  In

response, the PSR stated that Mr. Gomez-Castro had testified at trial that he was

working for an officer named "Adam," not "Don."  Moreover, the PSR concluded

that even if the court were to find that Mr. Gomez-Castro was not deliberately

untruthful on this matter, the court could still determine that an

obstruction-of-justice enhancement was appropriate in light of other aspects of Mr.

Gomez-Castro's trial testimony.  At the sentencing hearing, Mr. Johnson testified

that Mr. Gomez-Castro began working for him as an informant sometime around

March 2014 and continued his work for somewhere between six months to a year.

Mr. Johnson further testified that although, ideally, task force members formally

signed up informants, it was not uncommon for them to fail to do so.

The district court concluded that Mr. Gomez-Castro was subject to the

two-level enhancement for obstruction of justice.  The court reasoned that the

---

[1]     The U.S. Probation Office used the 2016 edition of the Guidelines in calculating Mr. Gomez-Castro's advisory sentencing range.  Mr. Gomez-Castro does not challenge this decision.  Therefore, we also rely on this edition of the Guidelines in resolving this appeal.

testimony presented at the hearing established that Mr. Gomez-Castro never had any formal arrangement with the Weber-Morgan Task Force, that he had no formal authorization to purchase drugs, that any relationship he had with Don Johnson terminated well before the transaction in the current case, and that there was no agent or officer named "Adam" associated with the Task Force—despite Mr. Gomez-Castro's various claims at trial to the contrary. The court sentenced Mr. Gomez-Castro to a term of 151 months' imprisonment.

Mr. Gomez-Castro then filed a motion for a new trial. He argued that his recollection of Mr. Johnson's name after trial was newly discovered evidence justifying a new trial under Federal Rule of Criminal Procedure 33. The government countered that a new trial was not warranted because the sudden recollection of Mr. Johnson's name after trial did not make it newly discovered evidence. Moreover, the government argued that Mr. Johnson's testimony would not have changed the outcome of the trial because it merely confirmed several dispositive facts: that on September 12, 2015, Ms. Figueroa was not working off charges, that Mr. Gomez-Castro was not working for Mr. Johnson and had not worked for him for more than a year, that Mr. Gomez-Castro had never been authorized by Mr. Johnson to directly participate in drug deals, and that Mr. Gomez-Castro never worked for a detective named "Adam."

On July 6, 2018, the district court denied Mr. Gomez-Castro's motion for a new trial "for the reasons stated in the Government's Response." R., Vol. I, at 242

11

(Order Denying Mot. for New Trial, filed July 6, 2018). Mr. Gomez-Castro then filed this timely appeal from his conviction and sentence.

### III

Mr. Gomez-Castro raises three claims in his appeal. First, he argues that three jury instructions from the district court amounted to reversible error: specifically, the court's instruction to the jurors authorizing them to discuss the evidence before formal deliberations, and its instructions concerning aiding-and-abetting liability and constructive possession—both of which allegedly omitted required intent elements. Second, he contends that the district court abused its discretion in denying his motion for a new trial. Finally, he insists that the district court erred in imposing a sentence enhancement for obstruction of justice. We consider—and reject—each of Mr. Gomez-Castro's claims.

### A

Mr. Gomez-Castro first argues that the three jury instructions were erroneous. We address each instruction individually. But, we begin by discussing the standard of review that applies to all three jury-instruction claims.

### 1

Ordinarily, we "review de novo the jury instructions as a whole . . . to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case." *United States v. Vernon*, 814 F.3d 1091, 1103 (10th Cir. 2016) (quoting

*United States v. Richter*, 796 F.3d 1173, 1185 (10th Cir. 2015)). Yet, as we discuss below, Mr. Gomez-Castro failed to properly object during his trial to all three instructions that he challenges here on appeal. That is, he failed to "inform the court of [his] specific objection" before the jury retired to deliberate. FED. R. CRIM. P. 30(d). Therefore, we shall review any alleged error in the instructions under the plain error standard of review. *See United States v. Visinaiz*, 428 F.3d 1300, 1308 (10th Cir. 2005) ("When no objection to a jury instruction was made at trial, the adequacy of the instruction is reviewed de novo for plain error."); *see also United States v. Zapata*, 546 F.3d 1179, 1190 (10th Cir. 2008) (noting that "a generalized objection to an instruction is insufficient to preserve a specific objection on appeal" and is "reviewed only for plain error").

A party seeking relief from a plain error must show "(1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights." *United States v. McGehee*, 672 F.3d 860, 876 (10th Cir. 2012) (quoting *United States v. Cooper*, 654 F.3d 1104, 1117 (10th Cir. 2011)). "An error seriously affects the defendant's substantial rights, as those terms are used in the plain-error test, when the defendant demonstrates 'that there is a reasonable probability that, but for the error claimed, the result of the proceeding would have been different.'" *United States v. Rosales-Miranda*, 755 F.3d 1253, 1258 (10th Cir. 2014) (quoting *United States v. Mendoza*, 698 F.3d 1303, 1310 (10th Cir. 2012)).

13

If these three factors are met, a court may correct the error on appeal if "it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cordery*, 656 F.3d 1103, 1105 (10th Cir. 2011); *see also United States v. Winder*, 557 F.3d 1129, 1136 (10th Cir. 2009) ("Under the plain error standard, 'even if a defendant demonstrates an error that is plain, we may only take corrective action if that error not only prejudices the defendant's substantial rights, but also seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" (quoting *United States v. Rivas-Macias*, 537 F.3d 1271, 1281 (10th Cir. 2008))).

Mr. Gomez-Castro concedes that he failed to object to two of the instructions—the one authorizing the jurors to discuss the evidence before formal deliberations and the one addressing constructive possession. At trial, Mr. Gomez-Castro lodged a general objection to the instructions on aiding-and-abetting liability. Yet he never specified "the grounds for the objection." FED. R. CRIM. P. 30(d). "Because the purpose of the objection is to give the court an opportunity to correct any mistake before the jury enters deliberations, an excessively vague or general objection to the propriety of a given instruction is insufficient to preserve the issue for appeal." *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 553 (10th Cir. 1999) (citation omitted).

Accordingly, in light of Mr. Gomez-Castro's failure to properly object at trial to the three jury instructions at issue, we review all three instructions under the plain error standard of review.

**2**

Mr. Gomez-Castro first contends that the district court committed reversible plain error when it repeatedly instructed jurors that they could talk about the evidence in the case before formal deliberations. We disagree. Instead, we conclude that this claim fails to satisfy the second prong of plain-error review, because any alleged error in these instructions was not "clear or obvious under current law." *McGehee*, 672 F.3d at 876.

At several points during the proceedings the district court informed the jurors that they could discuss the trial evidence before formal deliberations had commenced, so long as they were all together in the jury room and no one else was present. In its written preliminary jury instructions, the court instructed the jurors:

> [U]ntil this trial is over, the only time that you may discuss the evidence is when you are all together so that (1) each of you is present during the discussion, (2) in the jury room, (3) with no one else present. If one of those three conditions is not met, you may not discuss the case. That means that under any other circumstances you are not to discuss the case with fellow jurors or anyone else or permit anyone to discuss it with you.

Supp. R., Vol. VI, at 42 (Prelim. Jury Instrs., Instr. No. 13, dated Oct. 24, 2017). Later, during the trial, the district court judge twice reiterated these instructions in similar terms. For example, on the second day of trial the district court judge said:

15

> Remember you may not discuss the evidence in the case, and you
> don't have any evidence yet so don't worry about this right now.
> But you have to be present in the jury room, everybody all present,
> no one else present, door closed, then you can discuss the
> evidence.

Supp. R., Vol. III, at 146 (Trial Tr., dated Oct. 25. 2017); *see also id.* at 294–95

(Trial Tr., dated Oct. 25 2017).

Mr. Gomez-Castro argues that these instructions are "contrary to longstanding

and well-established law." Aplt.'s Opening Br. at 17. Yet he cites no Tenth Circuit

or Supreme Court precedent to this effect. Instead, in his opening brief, he cites

only one case from another circuit court, decided more than six decades ago, that

merely notes "the generally accepted principle that it is improper for jurors to

discuss a case prior to its submission." *Winebrenner v. United States*, 147 F.2d 322,

329 (8th Cir. 1945).

A reversible plain error must be *plain*, i.e., "clear or obvious under current

law." *McGehee*, 672 F.3d at 876. Mr. Gomez-Castro has failed to make this

showing. He has not provided—nor have we uncovered—any Tenth Circuit or

Supreme Court decision that holds that a district court is prohibited from permitting

jurors to discuss evidence before formal deliberations, as the court instructed here.[2]

---

[2] We note that at least one prior panel of this court, in an unpublished
opinion, has recently reached the same conclusion. *See United States v. Waldron*, 756 F.
App'x 789, 800 (10th Cir. 2018) ("No Tenth Circuit or Supreme Court precedent has held
that a district court commits error by allowing jurors to discuss a case before deliberations
begin.")

16

Yet, ordinarily, for an error to be "contrary to well-established law, either the Supreme Court or this court must have addressed the issue." *United States v. DeChristopher*, 695 F.3d 1082, 1091 (10th Cir. 2012) (quoting *United States v. Thornburgh*, 645 F.3d 1197, 1208 (10th Cir. 2011)).  Thus, even if the jury instructions here were erroneous, that error was hardly plain.

**3**

Mr. Gomez-Castro also challenges the district court's jury instructions on aiding-and-abetting liability—specifically, the court's failure to instruct the jury concerning the requisite intent for such liability.  We decline also to correct this error, however, because we do not believe—under plain error review—that Mr. Gomez-Castro has demonstrated that the error affected his "substantial rights." *McGehee*, 672 F.3d at 876.[3]

---

[3]    When reviewing challenges to jury instructions that were forfeited at trial (that is, not raised at trial through inadvertence or neglect) involving claims that the instructions omit a requisite element, we repeatedly have focused on the third prong of plain error review—that is, the question of whether the error affected the defendant's substantial rights. *See, e.g.*, *United States v. Giannukos*, 908 F.3d 649, 654, 658 (10th Cir. 2018) (holding that by failing to properly instruct the jury on the definition of constructive possession "the district court erred and that error was plain" and "conclud[ing] that the erroneous jury instruction affected [the defendant's] substantial rights"); *United States v. Kalu*, 791 F.3d 1194, 1204 (10th Cir. 2015) (holding that the district court's failure to instruct the jury on the intent element of fraud was "error [that] was plain" but that the defendant "has not shown the error affected his substantial rights"); *see also United States v. Campbell*, 763 Fed. App'x 745, 748–49 (2019) (unpublished)*; United States v. Scott*, 747 F. App'x 728, 731 (2018) (unpublished); *United States v. Martinez*, 749 F. App'x 698, 708 (2018) (unpublished).  For example, in the foregoing cited cases, we found that the omission of an element amounted to clear or obvious error, and our decisions have

17

We have made it clear before that aiding and abetting a drug possession with intent to distribute requires proof that "the defendant: (1) 'willfully associate[d] with the criminal venture,' and (2) 'aid[ed] such venture through affirmative action.'" *United States v. Delgado-Uribe*, 363 F.3d 1077, 1084 (10th Cir. 2004) (quoting *United States v. Jones*, 44 F.3d 860, 869 (10th Cir. 1995)). That is, "[t]he

---

turned on the third prong of the plain error analysis. And the same is true here with respect to Mr. Gomez-Castro's remaining two instructional challenges.

Lastly, though Mr. Gomez-Castro does not cite to the case—much less argue that it is applicable here—we pause for clarity's sake to distinguish this situation from the one found in *Neder v. United States*, 527 U.S. 1 (1999). In *Neder*, the Supreme Court held that, though it is a well-established matter of constitutional consequence, "the omission of an element is an error that is subject to harmless-error analysis." *Id.* at 15. In the instance of such an omission, the question is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* at 15 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). And there can be no doubt that the burden to establish harmlessness rests with the government. *See United States v. Rivera*, 900 F.2d 1462, 1470 n.5 (10th Cir. 1990) ("The prosecution bears the burden of proving that a constitutional error was harmless beyond a reasonable doubt."); *see also Chapman*, 386 U.S. at 24 (noting that the presence of "constitutional error . . . casts on someone other than the person prejudiced by it a burden to show that it was harmless."). But, importantly, the defendant in *Neder objected at trial* to the jury instructions that omitted the requisite materiality element of his alleged crimes. *See Neder*, 527 U.S. at 6 ("In accordance with then-extant Circuit precedent *and over Neder's objection*, the District Court instructed the jury that, to convict on the tax offenses, it 'need not consider' the materiality of any false statements." (emphasis added)). Here, however, Mr. Gomez-Castro failed to properly object at trial to any of the three purportedly deficient jury instructions. For that reason, we review his challenges to the jury instructions under the plain error standard of review. Consequently, on the question of prejudice, it is Mr. Gomez-Castro's burden to establish under the third prong of the plain error standard that any error affected his substantial rights—rather than the government's burden to establish that any error is harmless.

18

government must prove, through direct or circumstantial evidence, more than mere presence at the scene of the crime even if coupled with knowledge that the crime is being committed." *Jones*, 44 F.3d at 869. More specifically, "some showing of intent to further the criminal venture must be introduced at trial." *Delgado-Uribe*, 363 F.3d at 1084.

Here, the government appropriately concedes that the jury instructions were clearly or obviously erroneous (i.e., plainly erroneous) for not including an intent requirement. Therefore, we move to the third prong of the plain error standard of review: whether the error affected Mr. Gomez-Castro's substantial rights. Mr. Gomez-Castro must show that this error was "prejudicial," such that it "affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993). He must demonstrate "a reasonable probability that but for [the error claimed], the result of the proceeding would have been different." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Mr. Gomez-Castro argues that the error as to the aiding-and-abetting instruction "lessen[ed] the government's burden of proof and effectively depriv[ed] him of a defense to which he was entitled and which was supported by his own testimony." Aplt.'s Opening Br. at 22. Thus, he insists that if the court had included the intent requirement in its instructions, there is a reasonable probability he would not have been convicted.

19

The government counters by pointing to the extensive evidence presented at trial to establish that Mr. Gomez-Castro "participated in the criminal activity to make it succeed, and not to obtain useful information for law enforcement." Aplee.'s Resp. Br. at 36. Among the significant pieces of evidence that the government highlights are the following: twenty-nine phone calls Mr. Gomez-Castro placed between September 8 and September 12, 2015, arranging drug deals among Mr. Morales, Mr. Lopez, and his suspected supplier; testimony from law enforcement officers that Mr. Gomez-Castro and Mr. Morales, after leaving the supplier's home on September 12, arrived back at Mr. Gomez-Castro's apartment at the same time—undercutting Mr. Gomez-Castro's testimony that Mr. Morales, unbeknownst to him, went to his apartment and dropped off the box of methamphetamine; the fact that Mr. Gomez-Castro initially could not remember any information about his supposed law enforcement informant handler; and the fact that Mr. Gomez-Castro, by his own admission, last assisted local police as an informant in 2014, well before the drug deal at issue in September 2015. In light of all this evidence, the government insists that proper instructions on this issue "would not have made any difference." Aplee.'s Resp. Br. at 36

We likewise conclude that Mr. Gomez-Castro has not established that the instructional error affected his substantial rights. The overwhelming balance of the aforementioned evidence supports the conclusion that Mr. Gomez-Castro "willfully

associate[d] with the criminal venture" and "aid[ed] such venture through affirmative action." *Delgado-Uribe*, 363 F.3d at 1084.

Mr. Gomez-Castro insists that all of the conduct in question just as easily confirms his claim that he acted only with the intent of gathering information to pass along to law enforcement authorities. We disagree. His own conduct and testimony belies that claim. His testimony that he had repeatedly tried to call Mr. Morales when he saw the box in his apartment is contradicted by his own phone records from that day. And he flushed the methamphetamine in the box down the toilet when the police first arrived at his residence—suggesting an intent to conceal or destroy evidence of criminal wrongdoing, rather than an intent to make such evidence available to law enforcement. *Cf. United States v. Williams*, 985 F.2d 749, 753 (5th Cir. 1993) ("Evidence of the defendants' concerted effort to dispose of the cocaine supports a reasonable inference that all three men both associated and participated in possessing the drugs."). Furthermore, at no point during his discussion with the FBI agent on September 12 did he mention his supposed work as local police informant. Even assuming that Mr. Gomez-Castro's exculpatory explanations for such damning evidence are plausible, they do not convince us that there is a reasonable probability—that if the jury had been properly instructed concerning aiding-and-abetting liability—the result of his trial would have been different.

In sum, given the evidence presented by the government at trial, Mr. Gomez-Castro simply cannot adequately establish the third prong of plain error review.

**4**

Lastly, Mr. Gomez-Castro challenges the district court's jury instruction on constructive possession for its failure to include intent to possess as a required element. But, we again conclude that Mr. Gomez-Castro has not shown that this error affected his substantial rights.

The district court instructed the jury that constructive possession exists when a person "has the ability to exercise substantial control over an object that he does not have in his physical custody." Supp. R., Vol. VI, at 63 (Final Jury Instrs., Instr. No. 30, dated Oct. 17, 2017). Yet, the United States Supreme Court has expressly held that "[c]onstructive possession is established when a person . . . has the power *and intent* to exercise control over the object." *Henderson v. United States*, 135 S.Ct. 1780, 1784 (2015) (emphasis added). We, too, have expressly recognized that after the Supreme Court's holding in *Henderson*, "constructive possession requires *both* power to control an object and intent to exercise that control." *United States v. Little*, 829 F.3d 1177, 1182 (10th Cir. 2016) (emphasis added). The government rightly concedes that the district court's instructions were clearly or obviously erroneous in omitting this necessary component. But, at trial Mr. Gomez-Castro did

not object to these instructions on the ground that they omitted the necessary intent element.

As a result, we resolve this challenge under the third prong of the plain error standard. Mr. Gomez-Castro contends that the erroneous instruction "may very well have affected the jury's verdict." Aplt.'s Reply Br. at 10. He argues that if the district court had properly instructed the jury, the jurors might have believed his testimony that he did not know about the methamphetamine in his apartment, and thus did not intend to possess it. *See* Aplt's Opening Br. at 24.

In response, the government directs us to *United States v. Simpson*, 845 F.3d 1039 (10th Cir. 2017). In that case, we faced essentially the same issue as here: whether the omission of the requisite intent element—that *Henderson* prescribes—in jury instructions on constructive possession was reversible plain error. In *Simpson*, we concluded that the omission would not have affected the outcome of the case—and thus, the challenge failed under the third prong of plain error review. As we reasoned in *Simpson*:

> For Count 1, the jury found not only that Mr. Simpson had possessed cocaine, but also that he had intended to distribute the cocaine. Mr. Simpson could intend to distribute the cocaine only if he intended to possess it, for he could not distribute something that he didn't have. *See United States v. Paredes-Rodriguez*, 160 F.3d 49, 55 (1st Cir. 1998) ("[I]t simply makes no sense to assert that the same jury that found that [the defendant] intended to distribute the cocaine could have simultaneously found that he did not intend to possess it."). Thus, we know that the instructional error did not affect the outcome on the charge of possession with intent to distribute.

23

> Because the jury found Mr. Simpson guilty on this count, we know that the jury would have found that Mr. Simpson had intended to possess the cocaine. In these circumstances, the outcome on Count 1 would likely have stayed the same with a legally correct instruction on constructive possession. Thus, we reject the challenge to Count 1 under the third element of the plain-error test.

*Simpson*, 845 F.3d at 1060.

We agree with the government that the logic of our decision in *Simpson* resolves the present jury instruction challenge. By convicting Mr. Gomez-Castro of possession with intent to distribute, the jury necessarily found that he intended to distribute the methamphetamine. And Mr. Gomez-Castro could only have intended to distribute the methamphetamine, if he also had an intention of possessing it, "for he could not distribute something that he didn't have." *Simpson*, 845 F.3d at 1060. Mr. Gomez-Castro makes no serious attempt to distinguish *Simpson*, nor do we see how he could.

In short, because the jurors found Mr. Gomez-Castro guilty of possessing methamphetamine with the intent to distribute, they would have necessarily found that he also intended to possess the methamphetamine under a proper instruction on constructive possession. Therefore, Mr. Gomez-Castro simply cannot show "a reasonable probability that but for the error claimed, the result of the proceeding would have been different." *Dominguez Benitez*, 542 U.S. at 82.

24

**B**

Mr. Gomez-Castro next argues that the district court abused its discretion in denying his motion for a new trial. Under the Federal Rules of Criminal Procedure, a defendant may file a motion for a new trial on the grounds of "newly discovered evidence." FED. R. CRIM. P. 33(b)(1). A district court may vacate a judgment and grant a new trial "if the interest of justice so requires." FED. R. CRIM. P. 33(a). Here, we conclude that the alleged ground for Mr. Gomez-Castro's motion for a new trial—his recollection of the identity of Mr. Johnson—does not amount to permissible "newly discovered evidence" under Federal Rule of Criminal Procedure 33(b)(1).

We review a district court's denial of a motion for a new trial "for an abuse of discretion." *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999). An abuse of discretion occurs only if a decision is "based on an erroneous conclusion of law, a clearly erroneous finding of fact[,] or a manifest error in judgment." *United States v. Austin*, 231 F.3d 1278, 1282 (10th Cir. 2000) (quoting *Webb v. ABF Freight Sys., Inc.*, 155 F.3d 1230, 1246 (10th Cir. 1998)).

We have held that five requirements must be met before receiving a new trial on the grounds of newly discovered evidence. A Rule 33 movant in Mr. Gomez-Castro's position must show:

> (1) the evidence was discovered after trial; (2) the failure to discover the evidence was not caused by the defendant's lack of diligence; (3) the new evidence is not merely impeaching; (4) the

> new evidence is material to the principal issues [] involved; and (5) the new evidence would probably produce an acquittal in a new trial.

*United States v. Pearson*, 203 F.3d 1243, 1274 (10th Cir. 2000). Mr. Gomez-Castro has seemingly met the first, third, and fourth requirements; only the second and fifth requirements are truly at issue. We conclude that Mr. Gomez-Castro can satisfy neither.

Mr. Gomez-Castro argues that his failure to recall Mr. Johnson's name was not caused by his own lack of diligence for two reasons. First, he claims that it had been approximately three years since he had worked as an informant for Mr. Johnson, and, consequently, it was reasonable that he could not remember his name before the trial ended. Second, he contends that "[i]t was the prosecution's rebuttal case that made the newly discovered evidence so necessary," especially the police lieutenant's testimony that drew into question Mr. Gomez-Castro's claim that he had worked as an informant. Aplt.'s Opening Br. at 38.

We find neither reason persuasive. Mr. Gomez-Castro does not contend that he did not have sufficient time to prepare for trial. And, given that his defense turned in substantial part on his alleged cooperation with law enforcement, we are hard pressed to see how Mr. Gomez-Castro exercised due diligence in only recalling of his law enforcement handler after the trial. Moreover, Mr. Gomez-Castro's motion for a new trial makes clear that he had investigative resources at his disposal, so—even though his work for law enforcement may have occurred some

26

three years prior—he was not obliged to rely on the specifics of his memory alone in discovering the identity of his handler.

His second argument fails for a related reason. It was not—as Mr. Gomez-Castro would have it—the government's rebuttal witness, the Ogden Police lieutenant, that "made the newly discovered evidence so necessary," Aplt.'s Opening Br. at 38, but rather the nature of his defense itself, which relied on his prior cooperation with law enforcement. Contrary to Mr. Gomez-Castro's assertion, this lieutenant did not foreclose the possibility that an informant could have worked for the Ogden police without being formally signed up as such. And, therefore, the lieutenant's testimony did not have the necessary effect of communicating to the jury that Mr. Gomez-Castro was "lying," Aplt.'s Opening Br. at 38, when he testified about his cooperation. Nor did the government's rebuttal create some new need on Mr. Gomez-Castro's part to identify his law enforcement handler. Thus, in our view, Mr. Gomez-Castro fails to show that his inability to remember Mr. Johnson's name before trial was not caused by his own "lack of diligence." *Pearson*, 203 F.3d at 1274.

Moving to the fifth requirement, we seriously doubt that the new evidence would probably produce an acquittal in a new trial. Mr. Gomez-Castro insists that the government's case relied heavily on suggesting that he was untruthful about his work as an informant and, thus, also untruthful about his purported motives for engaging in the drug-related activity. As a result, Mr. Gomez-Castro claims Mr.

27

Johnson's testimony "would have so altered at least one juror's assessment of Mr. Gomez-Castro's credibility that the [trial's] outcome would have been different." Aplt.'s Opening Br. at 40.

But this argument simply ignores the abundance of other evidence—previously discussed at length—that casts serious doubt on the credibility of Mr. Gomez-Castro's claim that he was simply gathering information for local police. Therefore, we conclude that the district court did not abuse its discretion in denying Mr. Gomez-Castro's motion for a new trial.

## C

Finally, Mr. Gomez-Castro argues that the district court erred in imposing a two-level sentence enhancement for obstruction of justice. For reasons discussed below, we conclude that Mr. Gomez-Castro forfeited this objection by failing to raise it properly before the district court. Thus, we shall review this decision under the plain error standard of review; again, this means that Gomez-Castro must initially show "(1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights." *McGehee*, 672 F.3d at 876. Viewed under this standard, we hold that the district court did not commit an error that was "clear or obvious under current law" when it imposed a two-level sentence enhancement for obstruction of justice. *Id.* at 876.

Section 3C1.1 of the Sentencing Guidelines requires a two-level upward adjustment to a defendant's offense level "[i]f the defendant willfully obstructed or

28

impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. Perjury can be the basis for such an enhancement. *Id*. § 3C1.1 cmt. 4(B); *see also United States v. Dunnigan*, 507 U.S. 87, 92 (1993) ("[T]he phrase 'impede or obstruct the administration of justice' includes perjury, and the commentary to § 3C1.1 is explicit in so providing."); *United States v. Copus*, 110 F.3d 1529, 1536 (10th Cir. 1997) ("Obstruction of justice includes the offering of perjured testimony at trial."). A defendant commits perjury for the purposes of § 3C1.1 of the Guidelines if he "gives false testimony concerning a material matter with the willful intent to provide false testimony." *Dunnigan*, 507 U.S. at 94.

Yet, in order to apply the § 3C1.1 enhancement, "a sentencing court must make a specific finding—that is, one which is independent of the jury verdict—that the defendant has perjured herself." *United States v. Massey*, 48 F.3d 1560, 1573 (10th Cir. 1995). This finding must encompass "all of the factual predicates of perjury." *Dunnigan*, 507 U.S. at 95. That is, the court must find that a witness "(1) when testifying under oath, gives false testimony; (2) concerning a material matter; (3) with willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *Massey*, 48 F.3d at 1573. In determining whether each of these requirements has been satisfied, "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding." *Dunnigan*, 507 U.S. at 95. Additionally, "sentencing judges [must] specifically

29

identify or describe the perjurious testimony before applying the enhancement under § 3C1.1." *Massey*, 48 F.3d at 1573. Here, the parties dispute whether the district court's findings satisfy § 3C1.1's requirements.

In support of its decision to impose the enhancement, the district court set forth the following findings:

> The testimony that I've heard today shows that this defendant had no formal arrangement ever with the Weber/Morgan Task Force, that he had no formal authorization to purchase drugs either with his own money or anyone else's money, that any relationship he had with Don Johnson terminated well before the transaction in this case; in fact, before five of the related conduct transactions . . .; that there is no agent or officer named Adam associated with the Task Force, and that th[is] was the name that was given by the defendant at trial.

R., Vol. III, at 556 (Sentencing Hr'g., dated May 30, 2018). Mr. Gomez-Castro argues that these findings fail to satisfy the requirements established in *Dunnigan* and *Massey*. With the possible exception of the court's reference to the testimony regarding "Adam," Mr. Gomez-Castro argues that the court "failed to identify any specific testimony by Mr. Gomez-Castro that was both material and willfully false." Aplt.'s Opening Br. at 48. The government disagrees. It argues instead that the district court's findings were wholly sufficient because they encompassed all of the above-mentioned factual predicates of perjury and adequately identified the perjurious testimony.

As previously mentioned, we shall review the district court's decision to impose the sentence enhancement under the plain error standard of review. We do

30

so because we conclude that Mr. Gomez-Castro failed to properly raise his objection to the enhancement in the district court. More precisely, the challenge that he now raises on appeal is not the same challenge that he raised before the district court. In the district court, Mr. Gomez-Castro objected to the sufficiency of the *evidence* to support an enhancement; that is, he argued that none of his testimony was perjurious. *See* Aplt.'s App., Vol. I, at 137 (Def.'s Resp. to PSR, filed May 18, 2018) ("Based on the post-conviction investigation, Defendant asserts that he testified truthfully regarding his undercover work with the narcotic's task force."). However, Mr. Gomez-Castro did not object to the sufficiency of the *court's findings* at the hearing; that is, he did not argue that the district court failed to "specifically identify or describe the perjurious testimony before applying the enhancement under § 3C1.1." *Massey*, 48 F.3d at 1573; *see* Aplt.'s App., Vol. III, at 559 (after announcing its sentence and its rulings on Mr. Gomez-Castro's PSR objections, including the one concerning the § 3C1.1 enhancement, the district court asked "[d]id I miss anything," and Mr. Gomez-Castro's counsel's answer did not raise the adequacy of the court's perjury findings).

This distinction between an objection to the substantive basis for a § 3C1.1 enhancement—*viz.*, an objection to the sufficiency of the evidence that the defendant committed perjury—and an objection to the sufficiency of the court's factual findings concerning the alleged perjury (per *Dunnigan* and *Massey*) is a real one and a matter of consequence on the question of preservation. *See United States*

31

*v. Hawthorne*, 316 F.3d 1140, 1146–47 (10th Cir. 2003) (addressing separately the defendant's "attacks" on the § 3C1.1 enhancement, presented on the distinct "grounds" that, as a matter of substance, the defendant "did not commit perjury," and further, that "the district court's findings were inadequate"); *cf. United States v. Mendoza*, 543 F.3d 1186, 1191 (10th Cir. 2008) ("In this case, the government objected to the district court's proposed downward variance . . . but did so solely on substantive grounds. A party must specifically object to the district court's procedure in order to preserve that issue for review."); *cf. also United States v. Hernandez-Lopez*, 320 F. App'x 832, 836 n.1 (10th Cir. 2009) (unpublished) ("While defense counsel vigorously disputed substantive dimensions of his client's sentence, after the court explained its reasons for rejecting counsel's variance arguments . . ., counsel informed the court that it had no additional objections. It is far from clear whether counsel's substantive objections, coming *before* the court's explanations, put the court on notice that counsel viewed the court's *later* explanation for its sentence to be procedurally inadequate."). We thus conclude that Mr. Gomez-Castro forfeited his challenge to the district court's § 3C1.1 findings, and we review the adequacy of those findings under the plain error standard of review.

As noted, under the second prong of the plain-error analysis, Mr. Gomez-Castro must show that the alleged error was plain, i.e., "clear or obvious under current law," *McGehee*, 672 F.3d at 876. "Generally speaking, we do not

deem an error to be obvious and clear unless it is contrary to current 'well-settled law'—that is, to the current law of the Supreme Court or the Tenth Circuit." *United States v. Wardell*, 591 F.3d 1279, 1298 (10th Cir. 2009). Mr. Gomez-Castro has not shown that he can satisfy this standard.

His argument that the district court erred in imposing the sentence enhancement is based on a misreading of *Massey* and *Dunnigan*. The standard set forth in those cases for the required perjury findings is simply not as stringent as Mr. Gomez-Castro suggests. After all, in *Massey* we said that a sentencing court "need not recite the perjured testimony verbatim," but rather need only describe the testimony in a manner such that when this court "review[s] the transcript . . . [it need not] speculate on what the district court might have believed was the perjurious testimony." *Massey*, 48 F.3d at 1574. Weighed against this standard, we cannot say that the district court's findings were clearly or obviously erroneous. The court effectively identified as perjurious Mr. Gomez-Castro's statements regarding his arrangement with the Weber-Morgan Task Force, the timing of his cooperation relationship with Don Johnson, his statements regarding a Task Force officer named Adam, and the purported basis for his drug purchases. These findings—viewed in totality—do not clearly require us to "speculate on what the district court might have believed was the perjurious testimony." *Massey*, 48 F.3d at 1574. Stated otherwise, it is not clear or obvious that these findings are erroneous under *Dunnigan* and *Massey*; therefore, under plain error review, they pass muster.

33

We underscore that, under the plain error standard of review, the burden of proof is not on the government to show that the perjury findings fully comply with the requirements set forth in *Dunnigan* and *Massey*. Instead, Mr. Gomez-Castro must show that the findings are clearly or obviously contrary to this precedent. This he cannot do. The district court did not commit an error that was "clear or obvious under current law" when it imposed a two-level sentence enhancement for obstruction of justice. *McGehee*, 672 F.3d at 876.

## IV

For the foregoing reasons, we hold that the district court did not commit reversible error in its jury instructions, did not abuse its discretion in denying Mr. Gomez-Castro's motion for a new trial, and did not commit reversible error in applying an obstruction-of-justice enhancement under U.S.S.G. § 3C1.1 to Mr. Gomez-Castro's Guidelines sentence. Thus, we **AFFIRM** the district court's judgment as to Mr. Gomez-Castro's conviction and sentence.

ENTERED FOR THE COURT


Jerome A. Holmes
Circuit Judge

34